**SIGNED this 11th day of April, 2008.**

*Craig A. Gargotta*

_____
**CRAIG A. GARGOTTA**
**UNITED STATES BANKRUPTCY JUDGE**

---

## UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| SAVE OUR SPRINGS (S.O.S.) | § | Case No. 07-10642-CAG |
| ALLIANCE, INC., | § | |
| | § | Chapter 11 |
| Debtor. | § | |

## MEMORANDUM OPINION
## ON CONFIRMATION OF DEBTOR'S FIRST AMENDED PLAN
## AND RELATED MATTERS

The Court held a hearing commencing on November 5, and continuing on November 7, 8,

15, and 27, 2007, on the Debtor's First Amended Plan Combined with Disclosures for a Small

Business Case Pursuant to 11 U.S.C. sec. 1125(f). *See* Docket no. 52 (the "Plan" or the "First

Amended Plan"). Three parties objected to the Debtor's Plan. At the hearing on confirmation, two

of the objecting parties–Mak Foster Ranch, L.P. ("Mak Foster") and Cypress-Hays, L.P. ("Cypress-

Hays")–reached agreements with the Debtor and cast accepting ballots. The third objecting party,

Sweetwater Austin Properties, L.L.C. ("Sweetwater") appeared and argued that the Debtor's Plan

should not be confirmed. After five days of hearing and evidence, the Court took the matter under advisement.

Also set for hearing along with the Debtor's Plan were (1) the Debtor's Motion to Designate Sweetwater Austin Properties, LLC, and Related Entities, Pursuant to 11 U.S.C. § 1126(e) (Docket no. 57, the "Vote Designation Motion"), (2) the Debtor's Motion to Extend Time to Confirm Debtor's First Amended Plan of Reorganization, Pursuant to 11 U.S.C. §§ 1121(e)(3) and 1129(e) (Docket no. 59, the "Motion to Extend Time"), and (3) the Debtor's Application to Employ Special Counsel to Represent the Debtor in Certain State Court Litigation (Docket No. 44, the "Employment Application"). As further discussed below, during the hearing the Court partially granted the Motion to Extend Time. At the conclusion of the hearing, in addition to confirmation of the Debtor's Plan, the Court took these three matters under advisement (the Motion to Extend Time only to the extent of the relief requested that had not already been ruled on).

The Court has jurisdiction pursuant to 28 U.S.C. §§ 1334 and 151. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (L), and (O). This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rules of Bankruptcy Procedure 7052 and 9014. Where appropriate, a finding of fact shall be construed to be a conclusion of law, and vice versa. For the reasons stated below, the Court finds that the Motion to Extend Time should be **GRANTED** in part and **DENIED** in part, the Vote Designation Motion should be **DENIED**, and confirmation of the Debtor's Plan should be **DENIED**.[1] A separate order on each matter will be entered in conformity with this Opinion.

---

[1] After the hearing but prior to the issuance of this Opinion, the Court entered an order approving the Employment Application.

## CONTENTS

PRE-PETITION HISTORICAL BACKGROUND ........................................................ 4

PROCEDURAL HISTORY OF THE CASE
THROUGH THE CONCLUSION OF THE CONFIRMATION HEARING .............................. 5

OVERVIEW OF THE DEBTOR'S FIRST AMENDED PLAN AND ITS ASSETS ................. 7

ISSUES PRESENTED ........................................................................................ 11

EVIDENCE PRESENTED AT THE HEARING ......................................................... 13

ANALYSIS ...................................................................................................... 23

**Preliminary Issue I: Whether the Deadline to Obtain Confirmation
Can or Should Be Extended** ....................................................................... 24

Whether the 45-day Period Runs from the Filing of the Original Plan
or from the Filing of the First Amended Plan ...................................... 26

Whether the 45-day Period under § 1129(e) Should Be Extended
to Allow the Court to Consider the Evidence and Rule ....................... 29

Whether the Debtor Has Shown That It Is More Likely Than Not
That It Will Obtain Confirmation Within a Reasonable Time ............. 35

**Preliminary Issue II: Designation of Sweetwater's Vote
as Having Been Cast in Bad Faith** ............................................................ 36

**Plan Confirmation Issue I: Gerrymandering by Improper Classification
of Classes 4, 5, and 6** ............................................................................... 41

**Plan Confirmation Issue II: Lack of an Impaired Accepting Class** ........... 50

**Plan Confirmation Issue III: Best Interests of Creditors Test Not Met** ...... 51

**Plan Confirmation Issue IV: Feasibility of the Plan** ................................. 52

**Plan Confirmation Issue V: Discharge Is Not Permissible Where the Plan
in Essence Does Not Provide for the Debtor's Continuation in "Business"** ... 59

**Plan Confirmation Issue VI: Cramdown Is Not Permissible Where Insider Claims
Are Not Subordinated to Payment in Full of All Other Claims** ................ 60

**Plan Confirmation Issue VII: Lack of Good Faith** .................................... 63

SUMMARY AND CONCLUSION ........................................................................ 68

## PRE-PETITION HISTORICAL BACKGROUND

The Debtor, Save Our Springs (S.O.S.) Alliance, Inc. (referred hereinafter as the "Debtor" or "SOS") is a citizen action group whose primary purpose is to advance community awareness of water pollution and to protect water sources such as Barton Creek, the watershed in the surrounding community, and the Edwards Aquifer which is the primary or only water supply in central and south Texas.

The Debtor is a non-profit charitable organization as defined under § 501(c)(3) of the Internal Revenue Code. SOS Exh. 6, IRS letter granting exempt status to SOS. The uncontroverted evidence is that SOS relies almost exclusively on its donors who share the same vision that SOS does for water preservation and conservation. Although the evidence admitted at the hearing suggested that SOS's donors number in the thousands, the majority of its contributions come from a handful of generous donors.

William T. Gunn, III ("Gunn"), through Sweetwater and his other related entities, is a developer of communities and homes in the Austin area and south central Texas. One of Gunn's more recent developments is located in west Austin, in close proximity to Barton Creek. Well before the commencement of its bankruptcy case, SOS sued a municipal utility district ("MUD"), the Lazy Nine MUD, that had been created for that project, in state court in order to stop the development. SOS believed that the development would cause the Barton Creek Springs and the surrounding water supply to be contaminated, and sued on the grounds that the Lazy Nine MUD had been improperly created. The Lazy Nine MUD counterclaimed for its attorney fees and alternative relief.

The state district court found for the Lazy Nine MUD, including its counterclaim for attorney's fees. The decision was upheld on appeal and the Texas Supreme Court declined to grant review. Prior to the filing of the Debtor's bankruptcy case, Sweetwater became the holder of that

judgment by assignment and based on it has filed a proof of claim in this case in the amount of $294,847.68. Sweetwater ("SW") Exh. 2, Amended Proof of Claim. It is undisputed that the judgment was properly abstracted in Travis County, Texas, creating a judgment lien against all of SOS's real property in that County. Tx. Prop. Code § 52.001 (2007); SW Exh. 3, Abstract of Judgment.

As a result of the foregoing, SOS and Sweetwater entered into protracted settlement negotiations in an effort to resolve the issues. SOS has limited assets, consisting primarily of office furniture and equipment, with which to pay any judgment. As mentioned above, it relies almost entirely on donations to fund its operations. SW Exh. 1b, SOS's Schedules A, B. Given the nature of Sweetwater's claim against SOS, its donors were reluctant to provide funding that would in essence pay the developer for its attorney fees. Testimony of Ray Goodrich, Kirk Mitchell; *see also* SOS Exh. 22 and SW Exh. 27, (both) Grant Agreement with George Mitchell (providing grant funds not to be used to pay judgments). When settlement negotiations failed, SOS filed a petition under Chapter 11 on April 10, 2007.

## PROCEDURAL HISTORY OF THE CASE
## THROUGH THE CONCLUSION OF THE CONFIRMATION HEARING

Prior to and during confirmation of Debtor's Plan, this Court had to consider and either rule on or take under advisement a number of matters related to confirmation of Debtor's Plan, including but not limited to those mentioned above.

The Debtor filed its Plan Combined with Disclosures on September 19, 2007. Docket No. 38. On October 11, 2007, the Debtor filed its First Amended Plan Combined with Disclosures and after a contested hearing the Court approved that amended Plan by order entered October 12, 2007, as containing adequate information under § 1125(f)(1). Docket Nos. 52, 53.

The Court then set the confirmation hearing to commence on November 5, 2007. In light of that setting, the Debtor on October 31, 2007, filed a Motion requesting additional time pursuant

to § 1121(e)(3) in which to confirm its Plan (the Motion to Extend Time),[2] which Motion was taken up by the Court at the commencement of the confirmation hearing on November 5th. Docket No. 59. On that date, the Court partially granted that Motion orally, extending the time for Debtor to obtain confirmation of its Plan through the conclusion of the hearing on confirmation and the Motion to Extend Time. Having ruled only whether to extend the deadline that far, the Court took under advisement all other issues raised by the Motion to Extend Time, including whether the time to obtain confirmation ran from the filing of the Debtor's original Plan or from the filing of the amended version that was considered at the confirmation hearing, and whether that period should be extended from the conclusion of the hearing until the date of entry of Orders on confirmation and the Motion to Extend Time.

The Debtor also objected to Sweetwater's claim, alleging that: (1) its state court judgment was void as a matter of law because the judge who rendered judgment should have been disqualified; (2) the claim is overstated by roughly $30,000 in attorney's fees; and (3) Sweetwater does not have a secured claim as it alleges because there is not equity in the Debtor's assets to secure the claim. Docket no. 61. On February 21, 2008, after the confirmation hearing, the Court held a hearing on that objection to claim. Because, among other things, Sweetwater had amended its claim, the parties were able to reach a resolution as to the amount of Sweetwater's proof of claim and the fact that the claim should be treated as an unsecured because there is no value to the collateral that would secure the claim. As to the merits of the Debtor's objection that the Sweetwater claim is void because the state court trial judge should have been disqualified, the Court abstained from consideration of the merits and conditionally[3] allowed the parties to proceed in state court. Docket

---

[2] *See* discussion below regarding this and the other issues addressed in the Motion to Extend Time and Sweetwater's response thereto.

[3] The Court, in order to avoid prejudicial surprise from its *sua sponte* action, allowed the parties to brief the abstention issue after the hearing. None were filed, and so it issued an order

no. 126, Interim Order on Debtor's Objection to Claim of Sweetwater Austin Properties, L.L.C. (Claim No. 6).

As mentioned above, the Debtor also asked the Court to approve special counsel to file suit in state court to find the Sweetwater judgment void as matter of law. Docket no. 44. That matter was also heard in conjunction with the confirmation hearing, and taken under advisement at the conclusion of that hearing. The Court heard additional argument on the matter on February 21, 2008, after which it granted the Debtor's request. Docket no. 125, Order Approving Debtor's Application to Employ Special Counsel.

Finally, prior to the confirmation hearing Sweetwater requested that its claim be temporarily allowed under Federal Rule of Bankruptcy Procedure 3018(a). Docket no. 66. The Debtor agreed to that relief, and so the Court temporarily allowed Sweetwater's claim for purposes of both objecting to the Plan and counting Sweetwater's vote. Docket no. 87. Although the Debtor agreed to the temporary allowance of Sweetwater's claim, it nonetheless asked by separate motion (the Vote Designation Motion) that Sweetwater's negative vote be deemed not to have been cast in good faith under §1126(e). Docket no. 57. That Motion was also taken under advisement at the conclusion of the confirmation hearing.

To summarize once again, the Court has under advisement and now decides the following matters: confirmation of the Debtor's Plan, its Motion to Extend Time, and its Vote Designation Motion.

### OVERVIEW OF THE DEBTOR'S FIRST AMENDED PLAN AND ITS ASSETS

As noted herein, the Debtor has limited resources and assets, relying on donors to fund ongoing operations. These donations pay for the operating expenses, including the payroll for the

---

on March 24, 2008.

staff of SOS. Because of the Debtor's unique (in the world of debtors in bankruptcy, in any event) operations and revenue source, its Plan is not premised on paying creditors from ongoing operations or from future general donations, but rather from a designated "Creditor Settlement Fund" of $60,000.00. This fund is specially created for the pro rata payment of unsecured creditors' claims, including Sweetwater's. SOS Exh. 5, pp. 11-12 of the Plan.[4] The classification scheme and the amount of the proposed payments to Sweetwater under the Plan are the focal points of the dispute between it and the Debtor.

The Debtor's asset base includes a real property conservation easement that restricts the development and use of roughly 46 acres in Hays County, Texas. The easement limits development near the Jacobs Well spring to no more than six percent impervious cover. This easement is held jointly with a non-debtor party and, according to the evidence presented by SOS at the hearing (which the Court finds credible), has little liquidation value.

The Debtor's personal property consists of cash and general depository accounts totaling $10,309.26 as of the date of filing. SOS Exh. 2, Schedule B. In addition, the Debtor also has funds deposited in a Restricted Education Grant Account, which SOS contends is not property of the estate. SOS Exh. 2 and SW Exh. 1b, (both) SOS's Schedule B.

SOS also lists as an asset its claim for attorney's fees in the "Dripping Springs Litigation," which is the litigation in state court against Mak Foster and Cypress-Hays that was on appeal at the commencement of the bankruptcy case, and which has now been settled. Those settlements do not include any recovery on the Debtor's claim for attorneys fees.

In addition, the Debtor's name, "Save Our Springs Alliance," and its logo, website and domain name are also given unknown or limited values on its Schedule B. The parties spent some

---

[4] Administrative claims such as professional fees and employee deferred compensation will be paid in full at a later, unspecified date from the operating funds of SOS. SOS Exh. 5, pp.13-14 of the Plan.

time and effort at trial on the issue of the values of these assets, with Sweetwater attempting to elicit from SOS representatives Pat Brodnax, Kirk Mitchell and William Bunch opinions of value for these items. The Court finds, however, that the evidence adduced was not conclusive and did not establish a value for these items as to any owner other than SOS. While there is little doubt that the name "SOS" has a certain significance and notoriety in Austin and the surrounding communities, it was never established how these assets might be used by persons other than SOS (including its creditors), let alone what their value to those other persons might be. Although Sweetwater attempted on cross-examination to establish that the SOS donor list, mailing list and database could have some value to third parties, according to the credible testimony of the Debtor's CEO, Pat Brodnax, these items only have value to SOS but, given the special relationship between SOS, its mission, and its donors, they would be useless to third parties.[5]

Finally, the Debtor listed on its Schedules tangible personal property consisting of miscellaneous office furniture, fixtures, computer equipment, library materials and promotional goods, assigning them a total value of $9,345.00. There was ample evidence at the hearing to support this valuation: Ms. Brodnax noted the origin, extensive use, and relative age of the personal property. Moreover, substantially all of the Debtor's personal property (other than cash) is subject to Kirk Mitchell's lien securing a debt of roughly $175,000.00. Based on all the foregoing, the Court finds and concludes that there is no residual value in the personal property for the unsecured creditors. SW Exh. 1b, SOS Exh. 2, (both) Debtor's Schedule B and attachments.

Listed below in summary fashion is the classification and treatment of claims proposed in the Plan. (SOS ex. 5 at pp. 14-16).

---

[5] In particular, among other things, Ms. Brodnax testified that she had performed some comparative analyses of what other donor lists had sold for that showed that SOS's donor list might be worth only $150.00.

Class 1 – Ad Valorem Tax Claim of Travis County in the amount of $203.81. This claim was to be paid in full on or before January 31, 2008. Therefore, this Class is unimpaired.

Class 2 – Secured Claim of Kirk Mitchell. Mitchell was the guarantor of a line credit held by American Bank of Commerce ("ABC"). Mitchell purchased ABC's note and security interest prior to the filing of the bankruptcy petition, and so is currently owed the balance on the line of credit of approximately $175,000.00. Mitchell is secured to the extent of the value of the Debtor's tangible and intangible personal property other than cash and depository accounts – i.e., approximately $9,345.00. The remaining portion of this debt is included in Class 6 (general unsecured claims) as a deficiency claim. The Class is impaired and voted to accept the Plan.

Class 3 – Unpaid wage claims of SOS employees. The total amount of the claims is $6,235.00 and they are entitled to priority of payment under § 507(a)(4). These claims will be paid from the Debtor's operating funds. This Class is also impaired and also voted to accept the Plan.

Class 4 – Unsecured claim of Sweetwater Austin Properties. The Debtor proposes to pay the claim of Sweetwater out of the Creditor Settlement Fund of $60,000.00 once the claim is resolved. It will be paid pro rata with the other claims to be paid from that Fund – the judgment creditors in Class 5 and the other, general, unsecured claims in Class 6. This Class is also an impaired class, and rejected the Plan.

Class 5 – Unsecured judgment creditor claims of Cypress-Hays and Mak Foster. Both Mak Foster and Cypress-Hays won a judgment against the Debtor in a pre-petition lawsuit that the Debtor had filed against them in an effort to impede their development activities. At the time the Debtor's Plan was filed, that judgment was on appeal so that neither of these claims was resolved. Both of these creditors filed objections to the Plan. During the confirmation hearing, the parties announced that both claims had been resolved for purposes of treatment and voting for the Plan. Applications to compromise both claims were filed and approved.

In particular, Mak Foster agreed to limit its claim to $60,000.00. The Debtor and Mak Foster agreed to abate the Debtor's appeal to Third Court of Appeals pending this Court's ruling on confirmation of the Plan. This abatement of proceedings also includes, for a time, the Debtor and its employees not contesting Mak Foster's wastewater permit application for its Belterra development. The Mak Foster settlement is subject to this Court's confirming the Debtor's Plan. Should confirmation be denied, the parties would be free to exercise their rights on appeal. Docket nos. 64 and 85, Joint Application to Approve Compromise and Settlement Agreement Between the Debtor and Mak Foster Ranch, L.P., and Order granting same.

Cypress-Hays also reached a settlement with the Debtor. That settlement provides for Cypress-Hays having an allowed unsecured claim of $65,508.00 and a dismissal with prejudice of the Debtor's appeal of its litigation with Cypress-Hays. This agreement is not dependent on the Court's approval of the Debtor's Plan but rather is a full and unconditional resolution of all claims against each other and a liquidation of Cypress-Hays claim against the Debtor. Docket nos. 78 and 89, Joint Application to Approve Compromise and

Settlement Agreement Between the Debtor and Cypress-Hays L.P. n/k/a Rock Creek Holdings, L.P., and Order granting same.

Mak Foster and Cypress-Hays will be paid on a pro rata basis from the Creditor Settlement Fund. The First Amended Plan lists Class 5 as an impaired class within the meaning of § 1124(1), but does not take into account the settlements described above. Mak Foster and Cypress-Hays both cast affirmative votes for the Plan as a result of reaching their agreements with the Debtor.

Class 6 - all remaining unsecured claims not specifically listed in Classes 4 and 5. Kirk Mitchell's claim of approximately $100,000 based on an unsecured loan and his deficiency claim of approximately $165,000 are included in this Class. Class 6 claimants also will be paid pro rata from the Creditor Settlement Fund, and are also impaired. The Class accepted the Plan.[6]

## ISSUES PRESENTED

Sweetwater filed written objections to the Debtor's Plan that it argued during the confirmation hearing. Docket no. 72. Its primary complaints are that the Plan is not proposed in good faith and is not feasible, that the classification scheme is not permissible under § 1122(a) because Classes 4, 5 and 6 should be combined into one class of unsecured claims, and that, if they were so combined, the Plan cannot be confirmed because of the lack of an impaired, consenting class.

---

[6] Upon presentation of the ballot summary, Debtor's counsel acknowledged that there were nine members in Class 6, but only four had voted in favor of the Plan. There were therefore five non-votes. SOS Exh. 1, Ballot Summary. At the commencement of the confirmation hearing, Debtor's counsel requested, and the Court granted, an extension of time for the Debtor to obtain the consent of other members of the Class, but it was unable to do so. However, § 1126(c) provides that a class of claims is considered to have accepted the plan "if such plan has been accepted by creditors . . . that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors . . . that have accepted or rejected such plan." Accordingly, a non-vote is considered neither an affirmative nor a negative vote and Class 6, by operation of statute, is deemed to be an accepting impaired class because all the voting claimants accepted the Plan. Haydon, S.R., *When "No" Means "Yes": Non-Voting Creditors and Plan Acceptance*, 16 Am.Bankr.Inst.J. 22 (June 1997) ("if a creditor does not cast a ballot, the amount owed to that creditor, and the creditor as a member of a class, is not included in the computation of whether the class accepted the plan).

The following is a list of all of Sweetwater's objections (not necessarily in the order presented by Sweetwater). In the interest of completeness, the Court will address each of these issues separately and in detail, below.

1. Sweetwater asserts that the Plan fails to comply with § 1122(a) because its classification scheme, under which creditors in Classes 4, 5 and 6 receive identical treatment (pro rata payment from the Creditor Settlement Fund) but are split into three classes, is impermissible "gerrymandering" – a veiled attempt to obtain an impaired accepting class that would not exist otherwise but for the proposed classification.

2. Sweetwater argues that there is no impaired accepting class and so the Plan does not satisfy § 1129(a)(10), because :
   a. if Classes 4, 5, and 6 are combined as it argues they must be, Sweetwater's vote controls the impaired Class and it has not accepted the Plan; and
   b. the only other impaired class, Class 3 consisting of wage claims, cannot be considered an impaired accepting class because it includes only claims of the Debtor's employees which should be treated as insider claims, and/or because it is not a "true class."

3. Sweetwater contends that the Plan does not meet the "best interests test" of § 1129(a)(7), because it fails to include a meaningful liquidation analysis and the Debtor has not provided sufficient evidence of the liquidation value of its assets.

4. Sweetwater alleges that the Plan violates § 1129(a)(11) because it is not "feasible," in that its confirmation would most likely be followed by a need to convert the case to Chapter 7. In support, Sweetwater argues that the Debtor has not raised sufficient monies to fund the Creditor Settlement Fund and has not shown how it will pay administrative claims from operations.

5. Sweetwater argues that the Plan impermissibly provides for the discharge of the Debtor when the Chapter 11 discharge requirements in § 1141 have not been met. In particular, Sweetwater urges, the Debtor is in essence liquidating and not continuing its operations post-confirmation, having essentially transferred its fundraising and other operations to another entity, the Greater Edwards Aquifer Alliance, Inc. Because discharge is not available to debtors liquidating under Chapter 11, Sweetwater argues that SOS is not entitled to one in this case.

6. Sweetwater maintains that the Plan cannot be confirmed under § 1129(b), providing for "cramdown" of its claim, because its treatment is not fair and equitable. Specifically, it argues that the Plan does satisfies neither § 1129(b)(2)(B)(i) nor (ii) because it does not provide it with property of a value equal to the allowed amount of its claim as of the Effective Date of the Plan, nor are insider claims subordinated to its claim for purposes of distribution under the Plan.

7. Finally, Sweetwater argues that the Debtor and/or the Plan does not satisfy § 1129(a)(1), (2), and (3), because the Plan is not proposed in good faith. Specifically, Sweetwater argues

that, in addition to including an impermissible classification scheme, the Plan's provisions show that the Debtor does not intend to repay creditors to the maximum extent possible, which Sweetwater argues is the purpose of Chapter 11 reorganization.

The Debtor disagrees with Sweetwater's contentions, of course, and urges the Court to confirm the Plan as filed. It also argues that, regardless of the propriety of the classification, under § 1126(e) Sweetwater's vote should not be counted because it was cast in bad faith. Sweetwater of course denies that allegation.

Finally, the Debtor has asked for an extension of its deadline under to obtain confirmation, which Sweetwater opposes. The Motion to Extend Time, discussed and decided below, presents the issues of whether the time to request and obtain an extension has passed (including the issue of whether that period began to run from the Debtor's filing of its original plan, or from the filing of the First Amended Plan) and, if not, whether the Debtor has made the requisite showing to extend the deadline. The Court ruled orally at the hearing that it would extend the deadline through the conclusion of the hearing on confirmation and on the Motion to Extend Time, in order to consider the evidence on whether the Debtor had met its burden regarding whether it could confirm a plan.

## EVIDENCE PRESENTED AT THE HEARING

The proponent of a plan bears the burden of proving confirmation. *In re Briscoe Enter. Ltd., II*, 994 F.2d 1160, 1165 (5th Cir.) (concluding "that preponderance of the evidence is the debtor's appropriate standard of proof both under § 1129(a) and in a cramdown.") (footnotes omitted), *cert. denied, Heartland Fed. Sav. and Loan Ass'n v. Brisco Enter., Ltd., II*, 510 U.S. 992 (1993). SOS, therefore, provided the majority of witnesses at the confirmation hearing on its Plan. Summarized below are the portions of testimony and exhibits that the Court found most relevant to the confirmation issues presented.[7]

---

[7] In addition to the witnesses whose testimony is described below, the Debtor also called Laura Grulke, a member of SOS and a homeowner in the area where the Sweetwater development is located. The Court has not elaborated on her testimony here because it finds it

Ray Goodrich. Mr. Goodrich is a non-compensated member of SOS's board. He has provided his time, energy and money in support of SOS. Goodrich testified that he had committed to giving $12,500.00 towards the $60,000.00 amount needed to fund the Creditor Settlement Fund. He also testified that SOS was unable to pay creditors' claims in full over time, because donors would be reluctant to give if they knew that those funds would go to a developer. Goodrich acknowledged that, as of the confirmation hearing, SOS had not raised any amount, other than his $12,500 commitment, needed for the Creditor Settlement Fund.

Pat Brodnax. Ms. Brodnax has been a member of SOS for nine years. She serves as the managing director of SOS, but she is not a member of the board of directors. Her job duties include overseeing the day-to-day operations of SOS, fund raising activities, writing applications for grants and assisting in SOS's outreach and educational activities.

Brodnax testified that SOS's donor list has roughly 1,700-2,000 donors and its email list about 7,000 addresses. She noted that since SOS's bankruptcy filing donations have dropped off, most notably from SOS's largest donors. SW Exh. 1b, SOS Exh. 2, (both) Debtor's Statement of Financial Affairs. According to her testimony, donations to SOS were approximately $891,000 for 2005, $798,000 for 2006, and $54,000 for 2007 through the petition date on April 10th. In addition, Brodnax stated that SOS also does a mail-out to members three to four times a year, and that a mail-out in August 2007 was sent to approximately 2,000 persons.

Brodnax provided a summary of valuation of SOS's assets. SOS Exh. 2, Schedule B; SOS Exh. 5, Tabs N and O to the Plan, SOS balance sheets. She testified that SOS's space is leased and consists of seven offices with donated furniture. She could not give a value to the conservation easement that SOS had obtained. She also was unable to assign any particular value to SOS's name,

_____

cumulative or otherwise not particularly helpful with respect to the issues the Court must decide.

but testified that she did not think that it could be sold. According to her testimony, of all of SOS's donors, only five had given more than $10,000.00 in one donation and only one, Ray Goodrich, had ever given more than $50,000.00 directly to SOS. Finally, Brodnax testified that she did not think that the SOS donor list or mailing list would have much value to anyone other than SOS because of SOS's unique position in the community.

As to SOS's finances, Brodnax noted that the Debtor's failed support of some legislative efforts in 2006 had had a negative effect on its cash flow. Its profit and loss statements indicated gross revenue for 2006 in the amount of approximately $800,000 but only approximately $283,000 for 2007 through October 1, 2007. SOS Exh. 5, Tab C to the Plan, Debtor's Profit and Loss Statements for January 2006 through October 10, 2007. She noted that generally SOS pays its bills, salaries and taxes on a regular basis but that the bankruptcy filing had negatively affected donations. She was nevertheless unable to state whether SOS could satisfy its line of credit obligation to Kirk Mitchell. Brodnax also could not elaborate on how or when the deferred compensation to the Class 3 wage claimants would be paid, beyond noting that they would be paid only after payment to other creditors. Finally, she testified that when Kirk Mitchell wrote checks to SOS that he would add the notation "regional effort" on the checks, which indicated to her that the funds were to be used in support of the Greater Edwards Aquifer Alliance ("GEAA").

Kirk Mitchell. Mr. Mitchell has been active supporter of SOS and a contributor of significant amounts of money to SOS. He joined the SOS board in April 1994.

Kirk Mitchell testified that he had enlisted his father, George Mitchell, in supporting SOS and its ventures. He stated that he and his father are the two largest donors to SOS. He also noted that he and his father generally restrict their donations to legal efforts and salaries, but contribute also to SOS's operating budget. George Mitchell, according to his son's testimony, also supported SOS through making matching contributions to SOS's founding and support of the GEAA, which

Mitchell described as a non-profit entity whose primary function is to examine population and development growth over the Edwards Aquifer and ensure that the growth and development does not adversely affect it. In connection with this venture George Mitchell, through written agreement with SOS (the "2003 Grant Agreement"), agreed to donate over three years a total of $1.5 million "for educational, charitable and scientific purposes . . . to promote and effectuate the [Edwards Aquifer Sustainability Initiative]. SOS Exh. 22 and SW Exh. 27, (both) Grant Agreement dated November 19, 2003, between George Mitchell and SOS. According to Kirk Mitchell's testimony, SOS agreed to match his father's donations under the 2003 Grant Agreement on a 2:1 ratio (i.e., for every dollar that George Mitchell gave SOS for the GEAA, SOS would give the GEAA two additional dollars). The terms of George Mitchell's gift to SOS for the GEAA prohibited the money from being used, among other things, "to pay any judgment creditors of Grantee." SOS Exh. 22 and SW Exh. 27, Para. 1.2 of the 2003 Grant Agreement. It also provided that George Mitchell could terminate the Grant Agreement if, among other things, there was an "[e]ntry of a Monetary Judgment against SOS." SOS Exh. 22 and SW Exh. 27, Para. 6.1(c) of the 2003 Grant Agreement. Based on this provision and the entry of Mak Foster's and Cypress-Hays' judgment against SOS in August of 2004, George Mitchell cancelled his commitment under the 2003 Grant Agreement to fund the GEAA in November of 2004. SOS Exh. 23, letter dated November 22, 2004, notifying George Mitchell of that "Termination Event"; SOS Exh. 24, letter dated November 22, 2004, from George Mitchell notifying SOS of termination. However, George Mitchell has continued to support the GEAA by donating to SOS on a 2:1 basis following his termination of the 2003 Grant Agreement. SW Exh. 10, emails dated 2005-2007, evidencing requests for, and the giving of, sizeable donations by George Mitchell to SOS, some of which were designated as donations for the GEAA.

Kirk Mitchell also provided some testimony on the Debtor's other restricted gifts. He testified that in 2006 the Debtor's account at Prosperity Bank at one point held approximately $242,000.00. SW Exh. 9, Tab "2006," Debtor's Prosperity Bank statements. Prior to the filing of its bankruptcy case, the Debtor deposited and maintained most, if not all, of the restricted grant funds in that account, its main operating account. Id. For example, it appears that the funds of The R.H. and Esther F. Goodrich Foundation's "Community Outreach and Education Fund" grant (the "Goodrich Grant") were in SOS's operating account on the date of filing. SW Exh. 9, Tab "2006," letter dated December 21, 2006 (enclosing check for the Goodrich Grant), and December 30, 2007, bank statement (showing deposit of the Goodrich Grant on December 29, 2007); *see also* SW Exh. 9, Tab "2007" (showing deposit of what Debtor claims was the balance of the Goodrich Grant as of April 10, 2007, into new account on April 26, 2007).

In addition, Kirk Mitchell testified that he had guaranteed a number of lines of credit to SOS beginning in the 1990s. After SOS filed bankruptcy, according to Mitchell's testimony, ABC called his guarantee of SOS's note. Mitchell then purchased the note from ABC for $175,000.00 and ABC in turn assigned its security interest to Mitchell. He noted that if SOS defaulted on the ABC note, he would in essence own the SOS name. SW Exh. 12, minutes of SOS board of directors meeting September 19, 2006. That said, Mitchell admitted that he did not know whether he would use the SOS name if he came to own it.

Finally, Kirk Mitchell testified that while SOS has asked him to donate to help it pay its judgment creditors, as of the confirmation hearing he had not agreed to do so.

William Bunch. Mr. Bunch is the executive director and a paid employee of SOS. He was a founding member of SOS in 1992. Bunch is a staff attorney for SOS and has a background in environmental law. He testified that SOS has three lawyers on staff whose primary functions are legislative rule-making and court advocacy. Bunch was instrumental in drafting and securing

passage in 1992 of the "SOS Ordinance" for the City of Austin which places limitations on land use and protects endangered species. Further, Bunch stated that he had helped launch the GEAA and the regional effort to protect the Edwards Aquifer. Bunch, through SOS, has been involved in litigation regarding the proposed installation of a sewer line near Barton Creek, the building of an Austin Community College campus near Barton Springs, protection of endangered species in Barton Springs, and the expansion of Highway 281 in San Antonio over the Edwards Aquifer.

According to Bunch's testimony, SOS has been active in protecting the watershed east and south of the Edwards Aquifer and sponsoring initiatives to protect that watershed. He testified that SOS's involvement in the GEAA has allowed SOS to further its goals of protecting wildlife and ensuring conservation. Bunch also explained, however, that the agreements to restrict development over the Aquifer that SOS had secured as a result of its advocacy could be eviscerated should SOS be liquidated. SOS Exh. 42, Agreement Between City of Dripping Springs and Save Our Springs Alliance, Inc., dated February 18, 2005, and SOS Exh. 43, Mediated Settlement Agreement By and Between Headwaters Development Co. and Save Our Springs Alliance, dated as of May 22, 2007.

Bunch also provided testimony as to the valuation of SOS's assets and the prospect of increasing the amount of the Creditor Settlement Fund proposed under the Plan. First, he noted that due to the Debtor's agreements with Mak Foster and Cypress-Hays, SOS could not expect any monetary recovery from the Dripping Springs Litigation. He also testified that he believed that SOS's name had no value to other environmental groups.

Significantly, Bunch corroborated Goodrich's testimony that SOS had only collected $12,500.00 of the $60,000.00 needed to fund the Creditor Settlement Fund and, despite SOS's requests of its regular donors, donors had been non-responsive to its plea for funds to be used to pay off its judgment creditors. Bunch opined, based on his personal belief, that SOS could not pay its creditors any more than the proposed $60,000.

Additionally, Bunch testified that SOS employees had wage claims as of the petition date and that employees had also incurred unpaid wages during the Chapter 11 case. Bunch was not specific as to the proposed or anticipated timing of the payment of the wage claims, other than to note that they "would be paid at some later date," and that the employees had consented to such deferred payment. He also explained that the fees of SOS's professionals in the bankruptcy case had been capped and their hourly rate reduced, and such fees would only be paid after payments to other creditors. (the Debtor's professionals have consented to this treatment also.) According to Bunch, SOS does not have the ability to pay its attorneys and other creditors at the same time.

Bunch also testified regarding the litigation involving Lazy 9 MUD and the Sweetwater settlement negotiations, in which he was extensively involved. He maintained that Sweetwater's primary interest is to put SOS out of business so that Sweetwater and its principal, William Gunn, may further develop land in the Austin area. Bunch's statements as to Gunn's motivations are premised in part on the manner in which Sweetwater conducted settlement negotiations with SOS. SOS Exhs. 18 and 19, letter dated June 27, 2006, and email dated April 4, 2007, respectively, from attorneys for Forest City Sweetwater, L.P. (Sweetwater's predecessor) and the MUD to SOS attorneys regarding settlement. Specifically, Bunch contended that Sweetwater's purpose behind its dealings with SOS during settlement negotiations did not involve the payment of money to it, but rather were focused on limiting SOS's opposition to the Sweetwater development. He also testified that, during those unsuccessful negotiations, SOS had been willing to limit its opposition to the Lazy Nine MUD, but not to subsequent MUDs or Gunn developments. Further, Bunch stated that Gunn was concerned that, even if SOS gave assurances that it would not contest the Sweetwater development, such assurances would not be binding on SOS members who, on their own, might contest the Sweetwater development. SOS Exh. 18.

William Gunn. Mr. Gunn is the managing partner of Sweetwater, which purchased the real property contained within the Lazy Nine MUD and the judgment against SOS, prior to SOS's bankruptcy filing. SW Exh. 2, Amended Proof of Claim attaching copies of Assignment dated July 19, 2006, from Lazy Nine Municipal Utility District to Forest City Sweetwater Limited Partnership, and Assignment and Assumption of Service Contracts and Other Items dated January 26, 2007, from Forest City Sweetwater Limited Partnership to Sweetwater Austin Properties, LLC. The Lazy Nine MUD was created before any of Gunn's entities had an interest in the real estate. Gunn has developed over fifty communities and has developments in the vicinity of Austin, Buda, Kyle, Schertz and south San Antonio. He testified that he believes that SOS, through William Bunch, purposely waits until developments go forward and then sues the developer for money as opposed to opposing the development during the legislative process when the MUD is being considered.

Gunn also testified that SOS had offered Sweetwater $50,000.00 to settle the judgment but that he (Gunn) had insisted on getting paid every penny. SW Exh. 11, correspondence regarding the settlement negotiations. Moreover, on cross-examination he testified that he felt that, given SOS's tactics in attempting to thwart the Sweetwater development, it was appropriate to insist on full payment even if SOS did not have the ability to pay.

Gary McIntosh. Mr. McIntosh was offered by Sweetwater as an expert to opine on the Debtor's use of restricted funds. His experience with respect to various aspects of accounting for non-profit organizations and grant recipients was extensive, and the Court accepts him as such an expert.

McIntosh testified that he had reviewed, among other things, the Debtor's Schedules (SOS Exh. 2), its completed IRS Form 990s for 2004 and 2005 (SOS Exh. 5, Tab B), its completed IRS Form 990 for 2006 (SW Exh. 36), its profit and loss statements for 2006-07 (SOS Exh. 5, Tab C), its balance sheet as of its bankruptcy filing (SOS Exh. 5, Tab N), its bank statements for 2006-2007

(SW Exh. 9), and the grant letter and proposed budget (SOS Exh. 5, Tab E) for the Goodrich Grant. Most importantly, he also reviewed in detail the Debtor's books, including the QuickBooks entries that it had created as part of its bookkeeping.  SOS Exh. 5, Tab F.

McIntosh's analysis, which is shown in SW Exh. 33, was formed by his comparison of SOS's bank statements, including the deposit of restricted funds in connection with the Goodrich Grant, with the Debtor's bookkeeping entries showing expenses it attributed to those restricted funds. He did not, he testified, "go behind" the Debtor's designation of which expenses, and in what amounts, were attributable to the restricted funds.  Rather, he assumed those expenses were legitimately characterized by the Debtor as expenses authorized by the terms of the Goodrich Grant to be paid from the those funds.

By this comparison, McIntosh was able to show that, on a number of occasions prior to the filing of the bankruptcy case, the balance of the Debtor's bank account that included the restricted funds went below the amount its own books showed as the total of the restricted funds deposited less expenses attributable to those funds.  For example, according to McIntosh's analysis and opinion, on April 4, 2007, the Debtor's bank account in question contained only $16,142.78 in total, including both restricted and unrestricted funds.  Yet, on that same date, McIntosh testified that of the $60,000 of the Goodrich Grant restricted funds that had been deposited into that account on December 29, 2006, according to the Debtor's accounting entries only $13,027.29 had been spent on expenses authorized to be spent from the Grant money.  Accordingly, McIntosh opined, although $46,972.71 in restricted funds should have been in the account, only $16,142.78 *was* actually in the account on April 4, 2007, and therefore the *most* the Debtor had in Goodrich Grant restricted funds six days later on the petition date was $16,142.78.[8]

---

[8] After that low balance on April 4, 2007, there was a substantial deposit into the account, but the balance in the account decreased even further, below the April 4th balance, on April 6 and 9, 2007.  Those reductions in funds, however, were due to the Debtor's transfer, made on the

On cross-examination Debtor's counsel pointed out that the analysis that McIntosh provided does not take in account the fact that 20%, or $12,000, of the Goodrich Grant of $60,000.00 was used to pay for overhead, a use and amount specifically allowed under the terms of the Grant. SW Exh. 33; SOS Exh. 5, Tabs E and F. McIntosh testified in response that an upfront, lump sum deduction for all overhead allowed under the terms of a grant would not be an accepted accounting practice for non-profit organizations. Rather, he stated, the accepted practice would be for the grant recipient to deduct overhead periodically over the term of the grant, either in proportion to its term (e.g., for a grant with a twelve-month term, by taking monthly deductions of 1/12th of the total overhead allowed), or in proportion to the actual amount of the grant spent during that period (e.g., in a month where $15,000 of a $150,000 grant was actually spent, by deducting 1/10th of the total overhead allowed). His testimony was that the overhead, while reflected as a line item deduction that was inserted manually by the Debtor at the bottom of the its QuickBooks accounting records on the Grant, does not show up on the Debtor's balance sheet or its profit and loss sheet, as ever having been actually applied. SOS Exh. 5, Tab F. He did admit, however, that the express terms of the Goodrich Grant did not prohibit SOS from deducting all the overhead expense immediately. SOS Exh. 5, Tab E.

Debtor's counsel on cross-examination also questioned what effect the Debtor's transfers of the balance of the Goodrich Grant ($31,156.21, according to the Debtor's QuickBooks records on the Grant), from its operating account to a designated restricted funds bank account, had on McIntosh's opinion. McIntosh's response was that, given the smaller amount of restricted funds that his analysis shows that the operating account actually contained at that point, the transfers of a larger amount were only made possible by an intervening deposit by George Mitchell of $34,000 into the

---

advice of its bankruptcy counsel, of a total of $31,156.21 to another account that was set up as a designated and segregated restricted funds account (the "Segregated Account"). SOS Exh. 51.

operating account. Thus, if McIntosh's opinion is accepted, the initial deposits into the designated restricted funds bank account would have been only partially ($16,142.78) restricted funds, and the balance ($31,156.21 - $16,142.78 = $15,013.43) would have been non-restricted funds.[9]

Debtor's counsel also questioned McIntosh on cross-examination regarding what effect the delays between posting and clearing checks and between depositing funds and their posting to the account, had on his analysis. McIntosh testified that he took those matters into account in his analysis and in fact gave SOS the benefit of the doubt as to certain effects. For example, he reviewed all deposits made close in time to low balances in the account to determine if a delay in posting a deposit might have significantly lessened any shortfall in the operating account balance as compared to the QuickBooks recorded Grant balance. He also assumed that the date of the posting of an expense in QuickBooks was the date of its actual payment. In the absence of such an assumption, he pointed out, the shortfall in the amount of Grant funds actually in the operating account would only have been greater.

## ANALYSIS

As outlined above, Sweetwater filed an Objection to Confirmation that includes challenges to the Debtor's Plan on a number of bases under § 1129 and applicable law.

The Debtor has filed, however, the Vote Designation Motion requesting that the Court essentially disallow Sweetwater's vote as cast in bad faith. Because it remains a party in interest by virtue of the temporary allowance of its claim, such designation does not preclude Sweetwater from objecting to confirmation in general, and is irrelevant as to certain of its objections (such as the Debtor's lack of good faith in proposing the Plan), in light of the Debtor's burden to show, and

---

[9] No explanation was provided by either side as to why according to McIntosh's analysis the amount of Goodrich Grant funds less authorized expenses, or $46,972.71, if reduced by the amount of the entire overhead deduction of $12,000 as the Debtor urged, would not equal the amount the Debtor claimed was the balance of the restricted funds, or $31,156.21.

the Court's independent duty to determine, that all requirements for confirmation are met. 11 U.S.C.

§§ 1128(b) ("A party in interest may object to confirmation of a plan."), 1129(a) ("The court shall

confirm a plan only if all of the . . . requirements are met . . .."), Fed.R.Bankr.P. 3018(a)

("Notwithstanding an objection to a claim or interest, the court after notice and hearing may

temporarily allow the claim or interest in an amount which the court deems proper for the purpose

of accepting or rejecting a plan."); *In re Williams*, 850 F.2d 250 (5th Cir. 1988) (the court has the

mandatory independent duty to determine whether a plan complies with all confirmation

requirements, including the cramdown provisions when applicable); *see also In re Zahela*, 162 B.R.

309, 313 (Bankr. D. Idaho 1993) (standing of a party who objects to a plan was irrelevant where he

merely raised an issue that the court is required to decide regardless of whether there is an

objection).  Designation of Sweetwater's vote would, however, moot certain of its objections to

confirmation, such as impermissible classification.  Therefore, the Court will address the Vote

Designation Motion as a preliminary matter, prior to analyzing Sweetwater's objections to

confirmation.

Finally, the Debtor has filed a Motion to Extend Time to Confirm Debtor's First Amended

Plan of Reorganization, Pursuant to 11 U.S.C. §§ 1121(e)(3) and 1129(e).  Because that issue is

potentially determinative of whether the Court may even decide whether the Debtor's Plan should

be confirmed, and thus also of whether the Vote Designation Motion is even relevant, the Court will

initially address the Motion to Extend Time.

**Preliminary Issue I:**
**Whether the Deadline to Obtain Confirmation**
**Can or Should Be Extended**

The Debtor in its Motion to Extend Time and in the arguments of its counsel at the hearing

on that Motion requested that the Court make the following findings:

(1) that, for purposes of computing § 1129(e)'s 45-day period to obtain confirmation, because that period should be measured from the date of filing of the Debtor's

original Plan on September 19, 2007, the Court should find the period extended to November 5, 2007;

(2) that, in the alternative, the Court should find that the 45-day period runs from the filing of the Debtor's First Amended Plan on October 11, 2007–i.e., until November 26, 2007; and

(3) that the 45-day time period should be extended because the Debtor established on the first day of confirmation hearing–November 5–that it was more likely than not that the Court would confirm a plan within a reasonable amount of time.

Sweetwater objected to the Debtor's Motion to Extend Time. It argued that the Debtor could not possibly establish by a preponderance of the evidence within the 45-day period that it could confirm a plan within a reasonable time. Moreover, Sweetwater contended, any delay was due to the Debtor's failure to proceed in an expeditious manner to obtain confirmation, and in its proposing a plan that is not confirmable. Finally, Sweetwater through its counsel at the hearing contended that Congress mandated in § 1121(e)(3) that the showing that a plan can be confirmed within a reasonable amount of time must itself be made within the 45-day period, which for that purpose cannot be extended.

On November 5, 2007, the first day of the hearing on confirmation and on the Motion to Extend Time, after considering the arguments of counsel and the evidence at that stage of the proceedings, and for the reasons stated on the record, the Court ruled orally that the Motion to Extend Time would be partially granted. First, the Court ruled that the 45-day deadline created by Bankruptcy Code § 1129(e) ran from September 19, 2007, the date the Debtor filed its original Plan Combined with Disclosures for a Small Business Case Pursuant to 11 U.S.C. § 1125(f) in this case, until November 5, 2007. The Court now elaborates on its reasoning and provides written findings and conclusions in support of that ruling. Second, the Court also found and orally ruled that the time for the Debtor to confirm a plan should be extended until conclusion of the hearing in order to allow the Court to fully consider the evidence presented in support of confirmation and the Motion to Extend Time. The Court's findings and conclusions supporting this ruling also follow.

Finally, at the conclusion of the hearing on November 27, 2007, the Court took under advisement the underlying substantive issue presented by the Motion to Extend Time: whether the Debtor has shown that it is more likely than not that its First Amended Plan will be confirmed. The Court now holds that the Debtor did not make such a showing and the Motion to Extend Time should to that extent be denied, and sets forth its findings and conclusions in support of that ruling below.

## Whether the 45-day Period Runs from the Filing of the Original Plan or from the Filing of the First Amended Plan

The Debtor filed its Chapter 11 case under the "small business" provisions of the Bankruptcy Code. *See* 11 U.S.C. § 101(51C). Congress intended that the small business provisions of the Code would reduce the time and expense of Chapter 11 but have the attendant consequence that small business cases must proceed to confirmation on an expedited basis. As one court observed,

> [the small business] amendments were created "to expedite the process by which small businesses may reorganize under chapter 11." Floor Statements on the Bankruptcy Reform Act of 1994, 140 Cong. Rec. H10752, H10768 (daily ed. October 4, 1994) (analysis of Act's provisions appended to remarks of Rep. Brooks) (1994 WL 545773). Upon making the election, a debtor can take advantage of a more abbreviated confirmation process, including more liberal provisions for disclosure and solicitation. See H.R. Rep. 103-834, 103rd Cong., 2nd Sess. 30 (October 4, 1994), U.S.Code Cong. & Admin.News 1994, p. 3323; 140 Cong. Rec. H10768 (October 4, 1994). To reap the benefits of this expedited process, a debtor must meet certain abbreviated time deadlines. Included in these deadlines is the time restriction for filing a plan contained in 11 U.S.C. § 1121(e) . . ..

*In re Barnes*, 308 B.R. 77, 79 (Bankr. D. Colo. 2004) (footnote omitted). The small business provisions of BAPCPA show that Congress intended to expedite and streamline the process in those cases in order to lessen the costs to both the small business debtor and its creditors, and to more efficiently deal with those small business debtors that simply are not able to successfully reorganize.

First, § 1129(e) states that "[i]n a small business case, the court shall confirm a plan that complies with the applicable provisions of this title and that is filed in accordance with section

1121(e)(3) not later than 45 days after the plan is filed unless the time for confirmation is extended in accordance with section 1121(e)(3)."

Section 1121(e) provides, in relevant part:

(e) In a small business case–

\* \* \*

(1) only the debtor may file a plan until after 180 days after the date of the order for relief, unless that period is–

(A) extended as provided by this subsection, after notice and a hearing; or

(B) the court, for cause, orders otherwise;

(2) the plan and disclosure statement (if any) shall be filed not later than 300 days after the date of the order for relief; and

(3) the time periods specified in paragraphs (1) and (2), and the time fixed in section 1129(e) within which the plan shall be confirmed, may be extended only if–

(A) the debtor, after providing notice to parties (including the United States trustee), demonstrates by a preponderance of evidence that it is more likely than not that the court will confirm a plan within in a reasonable amount of time;

(B) a new deadline is imposed at the time the extension is granted; and

(C) the order extending the time is signed before the existing deadline has expired.

The intent of these sections is to require that plans in small business Chapter 11 cases be filed and confirmed in a relatively short period of time–filed within 300 days, and confirmed within 45 days of filing. Implicit in these requirements is that small business debtors ensure that they have filed plans timely and with adequate disclosures, and that they ensure that the confirmation hearings on those plans can be set, conducted and concluded within the prescribed 45-day period–or they are prepared to prove within that period that they are entitled to an extension.

At least one other bankruptcy court has held that the filing of an amended plan relates back to the filing of the original plan, analogizing to Fed.R.Bankr.P. 7015. *See* **In re Florida Coastal Airlines, Inc.**, 361 B.R. 286 (Bankr. S.D. Fla. 2007). However, the Court in that case was considering the issue of relation back for purposes of applying § 1121(e)(2)'s 300-day deadline for filing a plan in a small business case. The Court held that the debtor's amended plan, which was filed shortly after the expiration of that 300-day period and which, importantly, the Court characterized as "fundamentally a cleaned-up version of its original plan," related back to the filing of the original plan so that it (the amended plan) should be considered timely filed. The Court in **Florida Coastal Airlines**, however, was interpreting a different statute–§ 1121(e)(2)–and thus addressed a different issue from that presented here–whether the 45-day period under § 1129(e) should start over again with the filing of an amended plan. Nevertheless, this Court agrees with the Court in **Florida Coastal Airlines** that, at least when an amended plan is not substantially different from the original plan, the filing of the amended plan should relate back to the filing of the original plan for purposes of § 1129(e) as well.[10]

In this case, the Court finds that the Debtor's First Amended Plan did not differ substantially from its original Plan. The Court has already determined that the changes made with the amendment were not material, when it approved the disclosures in the First Amended Plan without further notice to parties in interest.[11] *See* 11 U.S.C. § 1127(f)(2) ("The plan, as modified, shall become the plan only after there has been disclosure under section 1125 as the court may direct, notice and a hearing,

---

[10] This ruling is limited to such facts; no inference should be drawn as to whether the 45-day period under § 1129(e) should start over again with the filing an amended plan which is not substantially the same as the original, or with the filing of another plan after confirmation of a previous plan has been denied.

[11] The only material change to the treatment of creditors' claims–the settlements with Mak Foster and Cypress-Hays–in fact came after the First Amended Plan was filed. The Court in approving those settlements also found that no further disclosures under § 1125 or resolicitation of votes was required.

and such modification is approved."); Fed.R.Bankr.P. 3019 ("If the court finds after hearing on notice . . . that the proposed modification does not adversely change the treatment of the claim of any creditor or the interest of any equity security holder who has not accepted in writing the modification, it shall be deemed accepted by all creditors and equity security holders who have previously accepted the plan.").

Therefore, for the reasons stated in ***Florida Coastal Airlines***, the Court holds that the 45-day period under § 1129(e) began to run with the filing of the Debtor's original plan, and did not start again when the First Amended Plan was filed.

Whether the 45-day Period under § 1129(e) Should Be Extended
to Allow the Court to Consider the Evidence and Rule

The 45th day after the filing of the original Plan on September 19, 2007, fell on a Saturday, November 3. Because Federal Rule of Bankruptcy Procedure 9006 provides that if the last day of "any period of time prescribed or allowed by . . . any applicable statute" falls on "a Saturday, a Sunday, or a legal holiday, or, when the act to be done is the filing of a paper in court, a day on which weather or other conditions have made the clerk's office inaccessible," then, in that event, "the period runs until the end of the next day which is not one of the aforementioned days." Therefore, in this case, the 45-day period ended on Monday, November 5.

The Debtor in this case filed its Motion to Extend Time on October 31, 2007, only five days (including a weekend) before the 45-day period elapsed. The Court's and the parties' schedules, partly because of the Thanksgiving holiday, did not allow for the confirmation hearing to be conducted continuously--rather, the five-day hearing took place spread over almost a month, beginning on November 5 and ending on November 27, 2007.

At the conclusion of the first day of the confirmation hearing (the last day of the 45-day period), Debtor's counsel pressed the Court to rule on the Motion to Extend Time, which would have necessarily required a finding that the evidence presented showed that it was more likely than

29

not that a plan would be confirmed within a reasonable time. The Court declined to do so, because there was at that point insufficient evidence to support such a finding. At that time, the evidence that had been received was limited to the testimony of Ray Goodrich and some but not all of the testimony of Pat Brodnax. The Debtor still had five additional witnesses to call and most of its approximately 50 exhibits to offer. In addition, none of Sweetwater's case, of course, had been presented. The Court had had no time to consider what evidence had been presented. For those reasons, the Court limited its oral ruling on November 5, 2007, on the Motion to Extend Time to an extension of the 45-day period only for so long as was necessary to complete the confirmation hearing and allow the Court to rule on the evidence presented.

According to the plain language of § 1121(e)(3), for a debtor to obtain a ruling that it had met its burden under that section and should have more time to obtain confirmation, it must position itself to: (1) ensure that the court has sufficient time to schedule, conduct and conclude a hearing on a motion to extend time to confirm a plan, and enter an order on such motion, before the expiration of the 45-day period, and (2) present sufficient evidence at the hearing to allow the court to find that confirmation is likely. *See generally* ***In re Caring Heart Home Health Home Corp.***, 380 B.R. 908, 910 (Bankr. S.D. Fla. 2008) (noting, in interpreting § 1121(e)(3), that "the analysis of a statute 'must begin with the language of the statute itself . . . and [absent] a clearly expressed legislative intent to the contrary, the language must ordinarily be regarded as conclusive'"), *quoting* ***Bread PAC v. Fed. Election Comm'n***, 455 U.S. 577, 580 (1982) (internal citations omitted). Moreover, unless a debtor is able to file and obtain a hearing on its motion to extend time well in advance of the end of the 45-day period, no purpose would be served by hearing the motion to extend time separately from the confirmation hearing. That is because the evidence that would allow the court to make the factual findings required by § 1121(e)(3) is virtually the same as that which would be offered at the confirmation hearing. Thus, in most instances the debtor will have

to act so that the confirmation hearing itself can be scheduled, conducted and concluded, and an order entered, within 45 days of the date the plan is filed. In many if not most cases this presents virtually insurmountable obstacles, particularly when the plan is amended after filing.

The small business provisions governing the timing of confirmation can be compared to the provisions of § 362(e), which also require the court to conduct a hearing within a specified period–within thirty days after the filing of a motion for relief from automatic stay. With respect to § 362, the Fifth Circuit Court of Appeals has placed the burden squarely on the debtor to do all it can to obtain a timely hearing and ruling from the Court. *See In re River Hills Apts. Fund*, 813 F.2d 702, 707 (5th Cir. 1987) ("[t]he debtor must, through 'aggressive litigation management,' obtain a timely hearing if it wants to ensure the continued protection of the automatic stay. Although the Bankruptcy Code imposes a duty upon the court to act within the appropriate time limit, it is the debtor's burden to call the issue to the court's attention if it desires that the stay be continued."). However, § 362(e) allows the court to extend the stay until a final hearing upon a finding that "there is a reasonable likelihood that the party opposing relief from such stay will prevail at the conclusion of such final hearing." With respect to Chapter 11 cases, such a showing requires the debtor to establish a reasonable likelihood that, among other things, there is "a reasonable possibility of a successful reorganization within a reasonable time." *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assoc., Ltd.,* 484 U.S. 365, 375-76 (1988) (internal quotations omitted).

While that standard on its face may sound similar to the "more likely than not that the court will confirm a plan within a reasonable time" language of § 1121(e), the jurisprudence under § 362 has established that the burden of proof under that section may not be as onerous as the language might indicate. Rather, the courts have required a lesser or greater showing by the debtor under § 362 depending on the stage of the case. *See e.g., In re Anderson*, 913 F.2d 530, 533 (8th Cir. 1990) ("bankruptcy courts should demand less detailed showings during the four months in which the

31

debtor is given the exclusive right to put together a plan"); *In re Grand Traverse Dev. Co. Ltd. P'ship*, 150 B.R. 176, 183 (Bankr. W.D. Mich. 1993) ("At the outset of the case, the debtor need only show that reorganization is 'plausible.' In the interim period as the expiration of the exclusivity period approaches the reorganization must be 'probable.' After the exclusivity period ends and confirmation draws near reorganization must virtually be 'assured.'"); *In re Playa Dev. Corp.*, 68 B.R. 549, 556 (Bankr. W.D. Tex. 1986) ("courts, in the early stages of a bankruptcy case . . . should be hesitant to find no reasonable possibility of reorganization, especially where the Debtor has not had sufficient time to formulate a plan.").

This Court finds that such a "sliding scale" approach is also appropriate with respect to § 1121(e)'s requirement that the debtor prove "by a preponderance of the evidence that it is more likely than not that the court will confirm a plan within a reasonable time," at least when the debtor has done all that it can do to present the issue and its evidence, and the failure to meet § 1121(e)'s deadline is a matter of the court's docket, outside of the debtor's control.

In this case, the Debtor has been diligent in filing, amending, and requesting a hearing on its Plan. The day that it filed the original Plan, in accordance with § 1125(f)(1) it requested that the Court not require a separate disclosure statement, or alternatively that the Court conditionally approve its disclosures pursuant to 11 U.S.C. Section 1125(f)(3). *See* Docket No. 39. It asked that the Court consider those requests on an expedited basis. *See* Docket No. 40. That request was promptly granted and the Court set a hearing on October 1, 2007, less than three weeks later. *See* Docket No. 41. At the hearing on approval of the Debtor's disclosures in connection with its Plan, it agreed to the added disclosures suggested by Sweetwater and directed by the Court, and so the Court continued the hearing for a short time to allow those amendments, which the Debtor promptly accomplished. At the continued hearing on October 9, 2007, the Court approved the disclosures as so amended in the First Amended Plan, and the Debtor requested a prompt setting on confirmation.

*See* Docket No. 52. The Court set that hearing to commence on November 5, 2007. In light of that setting, and realizing it was running up against the deadline in § 1129(e), the Debtor filed its Motion to Extend Time, submitted with it an order granting it, and requested an expedited hearing on it. *See* Docket Nos. 59, 60. The Court granted that request and set the hearing on the Motion to Extend Time on November 5, 2007, also.

By the time of that hearing, it was clear that Sweetwater's objection would not be resolved and that the hearing would not be concluded on November 5, but would be hotly contested and therefore protracted (although it is doubtful either counsel or the Court realized at that time that it would take as long as five full days). In a final effort to satisfy the requirements of the statute, on that first day of the hearing, November 5, which was the last day of the 45-day period, Debtor's counsel urged the Court to consider and grant its Motion to Extend Time, pointing out the language of the statute requiring the entry of the order prior to the expiration of the period. Notwithstanding counsel's pleas, however, the Court felt compelled to defer its ruling and the entry an order, finding it was simply unable to make the requisite findings on the issue of whether the Debtor had shown it was more likely than not that it would confirm a plan within a reasonable time.

Considering the foregoing, the Court finds that the Debtor in this case did all that was within its control to obtain an order on the Motion to Extend Time and/or confirmation of its Plan within the 45-day period. The Court can imagine nothing more that the Debtor could have done to give the Court the opportunity to make the necessary factual findings and rule within the time the 45-day period. Notwithstanding those efforts, however, because of the state of the evidence at that time, the Court was simply unable to rule and sign an order prior to the expiration of the 45-day period. The problem was not with the Debtor but, as one commentator has noted,

> 1129(e) strips the court of much discretion, and has the potential to create havoc with the Court's docket. . . . Many confirmation hearings are contested, requiring the attendance of witnesses who may not be available within the 45 day period. The

Court may not have sufficient time open in its calendar to complete a lengthy hearing within the 45 day period.

Hage, P.R., *Small Business Bankruptcy Provisions Under BAPCPA,* 16 Norton J. Bankr. Law and Prac. 3, Art. 1 (June 2007), *citing* Shefferly & Stein, *Small Business Chapter 11s Under the 2005 Bankruptcy Amendments*, Educational Materials for the American Bankruptcy Institute 13th Annual Central States Bankruptcy Workshop, pp. 267, 275-76 (June 15-18, 2006). This case might be considered a "worst case scenario" example of the "havoc" that can be created by a strict interpretation of § 1121(e)(3).[12] The Court finds BAPCPA's small business confirmation deadlines provisions–the onerous showing required under § 1121(e)(3) to get an extension, combined with the accelerated timeline for making that showing under §§ 1121(e)(3) and 1129(e)–are simply unworkable under the facts of this case. The Court is therefore reluctant to impose on the Debtor the full consequences of a failure to meet § 1121(e)'s deadline, inasmuch as that failure was due to the impossibility of the Court's receiving and considering the evidence in time to make the findings required to rule on the requested extension of that deadline.

In summary, this Court finds that the Debtor in this case did in fact employ "aggressive litigation management" and "call[ed] the issue to the court's attention." Under such circumstances, and for the limited purpose of extending the deadline to obtain confirmation for so long as is necessary for the Court to rule, the statutorily-required finding (that it is more likely than not that the debtor shall obtain confirmation within a reasonable time) should be deemed to be satisfied if

---

[12] Moreover, § 1129(e) is unique among the small business confirmation deadlines imposed by BAPCPA because of its focus on not only the debtor's actions but also the *court's*. Like § 1129(e), § 1121(e)(1) and (2) also set deadlines for a small business debtor. Section 1121(e)(1) sets a deadline by which the small business debtor who has not already filed its plan will lose its exclusive right to file one, and § 1121(e)(2) provides a deadline by which the small business debtor must file a plan. In contrast to § 1129(e)'s deadline for obtaining confirmation, however, these two other deadlines clearly apply to an action within a debtor's control–the filing of its plan. While all three deadlines are consistent with Congressional intent to move small business cases through the plan confirmation process expeditiously, § 1129(e) alone attempts to govern the court's involvement in that process.

the debtor can show it has acted promptly and "aggressively," and if a decision on the merits is imminent. That is the case here.[13]

### Whether the Debtor Has Shown That It Is More Likely Than Not That It Will Obtain Confirmation Within a Reasonable Time

Having now had the opportunity to review all the evidence presented at the hearing on the Motion to Extend Time and on confirmation of Debtor's First Amended Plan, however, the Court finds and concludes that the Debtor has failed to meet its burden under § 1121(e).

First, the Court finds that the Debtor properly noticed all parties of the Motion and the hearing on it. 11 U.S.C. § 1121(e) (requiring among other things that, to obtain an extension of the time to confirm a plan, the debtor provide notice to parties in interest, including the United States Trustee).

However, as explained in detail below, after considering *all* of the evidence presented during the *entire* five-day hearing, the Court finds that the Debtor failed to provide sufficient evidence that confirmation of the First Amended Plan is more likely than not, given the Court's ruling that confirmation of that Plan is denied. Accordingly, to that extent the Motion to Extend Time will be denied.[14]

---

[13] Moreover, to have denied the Motion to Extend Time on November 5th because the Debtor at that point had not been able to make the requisite showing would have been tantamount to denying it due process–the right to be heard, to have all of its evidence on the issue considered, when it had done all it could do to timely put the issues and that evidence before the Court and when the hearing on the Motion to Extend Time had already been commenced.

[14] Section 1121(e)(3)(c) requires that a court sign the an order extending the time period to obtain confirmation before the existing has expired. *See In re Caring Heart Home Health Corp.*, 380 B.R. 908, 910 (Bankr. S.D. Fla. 2008) (holding that "the language of the third requirement in section 1121(e)(3) is abundantly clear and must be read as 'conclusive'–if no signed order exists prior to the expiration of the 45 day deadline, then no extension can be granted"). The Court notes that the Debtor *did* submit a proposed form of order within the 45-day period–specifically, on October 31, 2007, when the Motion to Extend Time was filed. While the Court partially granted the Motion orally from the bench on November 5, 2007, it has yet to reduce its bench ruling to writing. Clearly, the better practice would have been for an order extending the time period to have been signed and entered on November 5, 2007. Under

### Preliminary Issue II:
### Designation of Sweetwater's Vote
### as Having Been Cast in Bad Faith

In its Vote Designation Motion, the Debtor requests the Court to designate Sweetwater's vote as having been cast in bad faith and relies on 11 U.S.C. § 1126(e), which provides:

> On request of a party in interest, and after notice and a hearing, the court may designate any entity whose acceptance or rejection of such plan was not in good faith, or was not solicited or procured in good faith or in accordance with the provisions of this title.

The consequence of such designation is that the vote is disregarded in the counting of votes to determine whether a class has accepted or rejected the Plan:

> A class of claims has accepted a plan if such plan has been accepted by creditors *other than any entity designated under subsection (e) of this section*, that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan.

11 U.S.C. § 1126(c) (emphasis added).

In the Vote Designation Motion, the Debtor contends the following facts support designation of the vote as made in bad faith:

1.   Sweetwater's principal, William T. Gunn, III, ("Gunn") desires to cause the Debtor to go out of existence.

2.   Sweetwater and Gunn's other entities would benefit more by putting the Debtor out of existence than by any recovery on its claim in this case.

3.   Sweetwater and Gunn have refused to negotiate in good faith, both before and during this case.

4.   There is no evidence the Debtor can pay more on Sweetwater's claim than it currently proposes to pay.

---

the circumstances of this case, however, where the Court had not yet been able to adequately consider the law and facts supporting an extension but the Debtor had been diligent in its efforts to obtain the necessary ruling and entry of the order, the Court finds that its order on these findings and conclusions fully satisfies the intent and purposes of the statute, and should be entered at this time.

5.     Sweetwater and Gunn refuse to acknowledge the distinction between funds that the Debtor owns or controls, and those controlled by its donors.

6.     Sweetwater's attorney admitted at the disclosure statement hearing that it "simply wants S.O.S. shut down because S.O.S. is 'antagonistic' to her client's development interests."

7.     Sweetwater and Gunn's development activities have caused harm to the Hill Country's streams and may in the future cause "much more damage."

8.     Sweetwater would get less in a Chapter 7 liquidation of the Debtor than under the Plan and the unsecured creditors would likely receive nothing, but Sweetwater still opposes the Debtor's efforts to reorganize and pay it a portion of its claim.

Good faith–and its converse, bad faith–are not defined in the Bankruptcy Code. Cieri, R.M., Oyer, B.J., Birnbryer, D.J.,*"The Long and Winding Road": the Standards to Confirm a Plan of Reorganization*, 3 J.Bankr.L.&Prac. 115, 134 (1994). Thus, the courts have developed the meaning of good (and bad) faith on the basis of the facts of each particular case. *Id.* In the case of § 1126(e), the courts generally agree that bad faith includes acting with an unacceptable ulterior motive:

> A creditor may not cast his vote for an ulterior purpose and expect to have it counted. Ulterior motives have been held to include 'pure malice, strikes and blackmail, and the purpose to destroy an enterprise in order to advance the interests of a competing business.'"

*Insinger Mach. Co. v. Fed. Support Co. (In re Fed. Support Co.)*, 859 F.2d 17, 19 (4th Cir. 1988), *citing In re Pine Hill Collieries Co.*, 46 F.Supp. 669, 671 (E.D. Pa. 1942), and *In re MacLeod Co., Inc.*, 63 B.R. 654 (Bankr. S.D. Ohio 1986).

Based on the foregoing recitation of the evidence presented at the hearing, the Court finds there it was insufficient to establish that the primary, or even a major, goal of Sweetwater and Gunn was to put the Debtor out of existence because of the Debtor's potential role in opposing other projects of Gunn's.

Rather, the Court finds that Gunn's (and, therefore, Sweetwater's) purpose, according to his credible testimony, is simply to obtain the best recovery possible on his claim. Such self-interest is not bad faith. *In re Pine Hill Collieries Co.*, 46 F.Supp. 669, 671 (E.D. Pa. 1942) ("If a selfish

motive were sufficient to condemn reorganization policies of interested parties, very few, if any, would pass muster."); *In re Landing Assoc., Ltd.*, 157 B.R. 791, 803 (Bankr. W.D. Tex. 1993) ("Mere selfishness does not rise to the level of bad faith, however, and self-dealing and good faith are not mutually exclusive."), *citing In re Frank Fehr Brewing Co.*, 268 F.2d 170, 180 (6th Cir. 1959), *In re Gilbert*, 104 B.R. 206, 216 (Bankr W.D. Mo. 1989) and *In re Featherworks Corp.*, 36 B.R. 460, 462 (E.D. N.Y. 1984).

Debtor argues that, objectively viewed, Sweetwater's rejection of the Plan does not make economic sense, so it must have another, improper purpose in rejecting it. It is for Sweetwater, however, and Sweetwater alone, to decide what is in its economic interest. *In re Fed. Support Co.*, 859 F.2d 17, 20 (4th Cir. 1988) ("It was for [the creditor] to decide its own self-interest."); *accord, Landing Assoc.*, 157 B.R. at 803 ("each creditor is expected to cast his vote 'in accordance with his perception of his own self-interest'"), *quoting Fed. Support*, 859 F.2d at 19; *see also In re Gilbert*, 104 B.R 206, 216 (Bankr. W.D. Mo. 1989) ("Good faith voting does not require, nor can it expect, a creditor to act with selfless disinterest.").

In *In re Landau Boat Co.*, 8 B.R. 432 (Bankr. W.D. Mo. 1981), the court rejected the debtor's contention that a creditor's vote should be designated as cast in bad faith because, among other things, the creditor's rejection made no economic sense. In so deciding, the court pointed out that "the purely selfish or self-interested reasons by which men judge what is best for themselves, even though they may seem unreasonable to others, do not necessarily amount to bad faith." *Id.* at 436, *citing* 6 *Collier on Bankruptcy*, ¶ 9.21 at 1676 (14th Ed.) and *Pine Hill Collieries, supra.*

The Debtor's complaint that Sweetwater has not negotiated in good faith is essentially this same argument–that Sweetwater's having refused a "good deal" is evidence that it is rejecting the Plan for some non-creditor, improper reason. This argument fails because, again, only Sweetwater can decide what is a "good deal" for it. *See Landau Boat Co.*, 8 B.R. at 436 (including in its

analysis of the debtor's argument regarding the lack of "economic sense" of the creditor's rejection

of the plan, the creditor's refusal to settle with the debtor for even more than the plan proposed to

pay). As the court in **Landing Associates** noted:

> Too, what debtors think represents a "good deal" may not look so rosy from a
> creditor's point of view, and the voting process is expressly designed to give
> creditors the opportunity to express how the plan looks to them. The fact that a
> creditor may not know what is good for it, therefore, can again, of itself, not be
> grounds for disqualifying that creditor's vote.

*Landing Assoc.*, 157 B.R. at 807.

Finally, Sweetwater's desire to avoid continued litigation over its claim is not the sort of

"non-creditor" interest that, even if it were its sole motivation in rejecting the Plan, would warrant

designation of its vote as made in bad faith. First, with respect to the proposed continued litigation

of Sweetwater's claim, this Court agrees with numerous others that a desire to end litigation also

does not amount to bad faith. *See e.g.*, *In re Lloyd McKee Motors, Inc.*, 157 B.R. 487 (Bankr. D.

N.M. 1993) (pendency of lawsuit by debtor against creditors was not sufficient basis for finding that

creditors' votes on plan had not been cast in good faith and, accordingly, could not be counted); *In*

*re A.D.W., Inc.*, 90 B.R. 645 (Bankr. D. N.J. 1988) (existence of district court litigation involving

creditor, debtor, and debtor's principals did not constitute grounds to designate vote of creditor as

not in good faith so as to disqualify creditor's vote on reorganization plan; plan, if approved, would

leave pending litigation undisturbed, and creditor would gain no benefit by rejection of plan);

*Landau Boat*, *supra* (in Chapter 11 proceedings, evidence failed to establish that unsecured

creditor's rejection of proposed reorganization plan was motivated by bad faith, notwithstanding

debtor's contention, *inter alia*, that rejection stemmed from fact that debtor and creditor were

engaged in antitrust litigation and liquidation trustee would have less incentive to pursue litigation

than would debtor's officers). Sweetwater's desire to end the litigation over its claim, like Gunn's

stated desire to be paid as much as possible on the claim, is part and parcel of Sweetwater's "creditor interest," and not a sufficient basis for finding bad faith and designating its vote.

It bears emphasizing that, as Judge Clark observed in **Landing Associates**, the issue is a difficult one and highly dependent on the specific facts proven:

> If a creditor sufficiently manifests a proper motive for the questioned activity, courts have been unwilling to second-guess the wisdom of the creditor's exercise of business judgment. . . . However, if the creditor fails to convince the court that the questioned activity was motivated by business judgment, then the court must inquire into the creditor's motives. . . . The standard is both inherently fact-intensive and difficult to apply, for what appears to be enlightened self-interest to a creditor may well appear to be an ulterior motive to the debtor.

*Landing Assoc.*, 157 B.R. at 803 (citations omitted). That said, even though the Court is reluctant to substitute its judgment for the creditor's, it nevertheless does not believe that bad faith, as the basis for designating a creditor's vote, requires a showing of wrong-doing on the creditor's part. *See id.* at 807 (finding such a test to be "far too strict a test to make section 1126(e) serve as the useful tool it was intended to be"). However, it does require some showing that Sweetwater's motive was more than, or other than, a desire to obtain a larger recovery on its claim and to bring lengthy litigation over the claim to an end. Unlike other cases where creditor's votes were designated because cast in bad faith, Sweetwater's conduct in this case shows no effort to "torpedo" the Plan at all costs. *See e.g., Landing Assoc.*, 157 B.R. at 808 (noting that the large amount of attorneys fees spent by the creditor was evidence of its disregard for its interests *qua* creditor and of its intent to destroy the debtor at all costs); *In re The Heritage Org.*, 375 B.R. 230, 305 (Bankr. N.D. Tex. 2007 (noting the dilatory, obstructionist tactics of the creditors whose votes were designated). Rather, considering the pleadings and the litigation history of the Debtor and Gunn's entities, including the Lazy Nine MUD and Sweetwater, the latter's conduct could just as well be seen as defensive of the Debtor's actions, and not offensive at all.

Based on the foregoing, the Court finds and concludes that the Vote Designation Motion should be denied.

### Plan Confirmation Issue I:
### Gerrymandering by Improper Classification of Classes 4, 5, and 6

Sweetwater argues that the classification of its claim separate from other unsecured claims improperly violates 11 U.S.C. § 1122(a) and therefore the First Amended Plan fails to satisfy § 1129(a)(1). The latter section requires that, in order to be confirmed, a plan must comply with the applicable provisions of the Bankruptcy Code. The specific provision that Sweetwater alleges the Plan fails to satisfy is § 1122(a), which provides, in relevant part, that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."

As outlined above, the Debtor's Plan classifies the claim of Sweetwater, which is based on what the Debtor concedes is a final (albeit, allegedly, voidable) judgment, as the sole Class 4 Claim. The treatment provided on the claim, assuming its allowance, is identical to that provided for Class 6 (the class of General Unsecured Claims)–i.e., pro rata payment from the $60,000 Creditor Settlement Fund.

The treatment of Sweetwater's claim was also identical to that originally proposed in the Debtor's Plan for Class 5, consisting of the unsecured judgment claims of Mak Foster and Cypress-Hays. However, the treatment of those claims was subsequently altered by their settlement with the Debtor on the eve of, or during the course of, the confirmation hearing. With the Court's approval of those settlements (and, in the case of Mak Foster, also contingent upon confirmation of the Plan), the Debtor's appeal of the judgment in the Dripping Springs Litigation is dropped, its claims (including its claims for attorneys fees) are released, and the claims of Mak Foster and Cypress-Hays are liquidated and allowed at fixed, agreed-upon amounts. The Debtor also agreed to drop its opposition to a wastewater permit being sought by Mak Foster. Unlike the Cypress-Hays'

41

settlement, the Mak Foster settlement is expressly conditioned upon confirmation of the Plan as proposed or as further modified with Mak Foster's agreement.[15] Both creditors' claims will still be paid pro rata from the Creditor Settlement Fund, but based on the agreed allowed amounts.

In its Objection to the Plan addressing the issue of classification, Sweetwater argues that Classes 4, 5, and 6 should be combined as a single class of unsecured claims, given that the treatment of the three classes is identical. This argument preceded the settlements with the Class 5 claimants, and Sweetwater has not amended its pleadings. While it is not clear whether Sweetwater still contends that Class 5 should be combined with the Class 6 claims and Sweetwater's claim at this point, in light of the settlements and out of an abundance of caution, the Court will assume that it does.[16]

As stated above, § 1122(a) provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." Because Sweetwater's claim is the only claim in Class 5, it cannot be said that it is not "substantially similar to the other claims or interests of such class," and that in fact is not Sweetwater's argument. Rather, Sweetwater argues that its claim is substantially similar to the claims in Classes 4 and 6,[17] and that the Debtor's separate classification is an improper attempt to

---

[15] Class 5 now contains two claims whose treatment differs from one another. Because the only two holders of claims in the Class have consented, however, the classification and treatment currently proposed under the First Amended Plan is permissible. *See* 11 U.S.C. § 1123(a)(4) (requiring that a plan, to be confirmed, must "provide the same treatment for each claim or interest of a particular class, *unless the holder of a particular claim* or interest *agrees to a less favorable treatment of such particular claim* or interest.") (emphasis added).

[16] It is not known under the facts presented whether such a hypothetical classification scheme would pass muster under § 1123(a)(4), because it cannot be known whether those creditors in the class who receive less favorable treatment than other creditors in that same class would consent as required by § 1123(a)(4).

[17] Sweetwater's original proof of claim asserted a secured claim in the amount of $328,353.70, but it later amended that claim to assert that the value of the assets to secure its alleged judgment lien was $0.00 and that its unsecured claim was, therefore, $294,847.68. Accordingly, it now asserts only an unsecured claim, and the Debtor has agreed to that status,

keep Sweetwater from controlling, as a result of the size of its claim, the voting of the class if it had been classified with the other unsecured creditors.

In *Greystone,* the Fifth Circuit Court of Appeals did note that § 1122(a) on its face "only governs permissible *inclusions* of claims in a class rather [than] requiring that all similar claims be grouped together." *Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture),* 995 F.2d 1274, 1278 (5th Cir. 1991), *cert. denied, Greystone III Joint Venture v. Phoenix Mut. Life Ins. Co.,* 506 U.S. 821 and 506 U.S. 822 (1992). However, the *Greystone* Court overruled, as "totally permissive," the lower courts' interpretation of the subsection, holding instead that "Section 1122 must contemplate some limits on classification of claims of similar priority [and that a] fair reading of both subsections [of § 1122(a)] suggests that ordinarily 'substantially similar claims,' those which share common priority and rights against the debtor's estate, should be placed in the same class." *Id.* In examining the parameters of that general rule, the Court articulated "the one clear rule that emerges from otherwise muddied caselaw on § 1122 claims classifications: thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan." *Id.* at 1279. This, in essence, is Sweetwater's argument—that the First Amended Plan classifies its claim solely to gerrymander an affirmative vote. *See id.* ("if § 1122(a) permits classification of 'substantially similar' claims in different classes, such classification may only be undertaken for reasons independent of the debtor's motivation to secure the vote of an impaired, assenting class of claims.").

"A debtor's motives must be scrutinized to prevent the possibility of vote manipulation." *Heritage Org., supra* at 298 (Bankr. N.D. Tex. 2007), *quoting One Times Square Assocs. Ltd. P'ship v. Banque Nationale de Paris,* 165 B.R. 773, 778 (S.D. N.Y. (1996). "[N]otions of basic

---

although it still contends that the claim should be disallowed in its entirety based on its argument the judgment was void. Docket No. 126, Interim Order on Debtor's Objection to Claim of Sweetwater Austin Properties, L.L.C. (Claim No. 6).

fairness and good faith" are the source of the rule against separate classification of similar claims solely for gerrymandering purposes. *In re SM 104, Ltd.*, 160 B.R. 202, 217 (Bankr. S.D. Fla. 1993).

"Whether the motive for separate classification is gerrymandering is a question of fact." *Heritage Org.*, *supra, citing In re Northwest Timberline Enters., Inc.*, 348 B.R. 412, 438 (Bankr. N.D. Tex. 2006); *see also Greystone*, 995 F.2d at 1281 ("Two standards of appellate review apply to the debtor's classification of claims. Issues such as the similarity in priority and legal attributes and the ultimate question whether treatment in the same or separate classes is necessary, are legal issues reviewable by our court de novo. . . . Whether there were any good business reasons to support the debtor's separate classification of claims is a question of fact.").

Most courts have looked to see if there is some business or economic reason *independent of* the debtor's need to separately classify a claim to confirm a plan. *Principal Mut. Life Ins. Co. v. Baldwin Park Towne Ctr., Ltd. (In re Baldwin Park Towne Ctr., Ltd.)*, 171 B.R. 374, 376 (Bankr. C.D. Calif. 1994) (emphasis added). Thus, the courts look at whether there are additional reasons for the classification other than the fact that it will, in essence, deprive the complaining creditor of its leverage. *See In re Boston Post Road Ltd. P'ship*, 21 F.3d 477, 483 (2d Cir. 1994) (a "debtor must adduce credible proof of a legitimate reason for separate classification of similar claims").

SOS asserts that there is no evidence of gerrymandering, but that "there are valid business and legal reasons for placing the various creditors into the classes in which they are listed in the First Amended Plan." Brief of the Debtor in Possession, Save Our Springs Alliance, Inc., on Issues of Claims Classification and Bad Faith ("Debtor's Classification Brief"), p. 3. However, it never really articulates what those business or "practical" reasons for separate classification are. In *Greystone*, the Court rejected the debtor's "realities of business" argument for separate classification of a large deficiency claim, calling the argument "specious," because "it fail[ed] to distinguish between the classification of claims and the treatment of claims," where the plan provided the same treatment

for the deficiency claim as it provided for the class of general unsecured claims. 995 F.2d at 1280-81. Like the plan in *Greystone*, the Debtor's Plan in this case provides treatment of Sweetwater's claim that is identical to that provided the general unsecured creditors' claims. Therefore, like the Court in *Greystone*, this Court rejects any "business reason" argument that the general unsecured claims of the "trade" creditors in Class 6 need to be separately classified so that they will be more likely to continue to provide services and goods to the reorganized Debtor.

Next, the Debtor argues that there is a legal reason for separate classification. SOS contends that separate classification is permissible because Sweetwater's and the Class 5 creditors' claims are unliquidated and disputed, while the Class 6 claimants are liquidated and undisputed. Since the time when it first made that argument, however, the Class 5 creditors' claims have been settled and are now liquidated. Neither the Debtor nor Sweetwater has amended its arguments to take those settlements into account, but the Court notes that, even if Classes 5 and 6 (both now containing unliquidated and undisputed unsecured claims) were combined, neither Sweetwater's nor the Debtor's legal argument with respect to Sweetwater's separate classification would be affected.[18]

"Each class of creditors will be treated in the debtor's plan of reorganization based upon the similarity of its members' priority status and other legal rights against the debtor's assets." *Greystone*, 995 F.2d at 1277 (*citing* 11 U.S.C. § 1122). The Debtor argues that Sweetwater, as the holder of a final judgment, has rights not available to the other general unsecured creditors, such as the remedies of execution, garnishment, and creation of a judgment lien. Sweetwater's legal status vis-à-vis its claim, SOS contends, is sufficiently different to makes it distinguishable from the other unsecured claims.

---

[18] Sweetwater's claim, if included in a class with either or both the Class 5 claims and the Class 6 claims, would control the voting of the class.

Considering the facts of this case, however, the distinction that the Debtor seeks to draw is one without a difference. It is true that ordinarily, outside of bankruptcy and absent the automatic stay, the holder of a final non-appealable judgment could pursue rights and remedies not available to unsecured creditors. In Sweetwater's case, however, those rights and remedies are illusory, given the nature of the Debtor's assets and their lack of value over and above Kirk Mitchell's prior lien. Sweetwater's willingness to waive its secured status in the case confirms this reality. There is simply is no value to any lien that Sweetwater could assert, no asset for it to levy on. To separately classify its claim from the Class 6 general unsecured claims merely because of rights that are theoretically held but meaningless in practice, is to elevate form over function. The Court rejects this argument of the Debtor, under specific facts of this case. *See Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co., Inc. (In re U.S. Truck Co., Inc.)*, 800 F.2d 581, 586 (6th Cir. 1986) (finding "one common theme in the prior case law that Congress incorporated into section 1122[, that] the lower courts were given broad discretion to determine proper classification according to the factual circumstances of each individual case").

However, the Court finds that separate classification of the Class 5 claims *is* permissible. Those unsecured claims, as a result of Mak Foster's and Cypress-Hays' settlements with the Debtor, are now fixed and liquidated. The Debtor is dropping its appeal of the judgment, and giving releases and other consideration in the case of Cypress-Hays. The Class 5 claims are thus uniquely situated. The rights of the Class 5 creditors, as compared with Sweetwater and the other unsecured creditors, differ sufficiently to permit the Class 5 claims to be separately classified. *See Heritage Org.*, 375 B.R. at 303 ("Generally, claims of the same legal character and effect will be classified together.").

Finally, the Debtor argues that Sweetwater has a "non-creditor interest" that it is attempting to protect by opposing the Plan, and that justifies separates classification.[19] The Debtor is correct in pointing out that the Fifth Circuit and other courts have recognized that where the separately classified creditor has some non-creditor interest that "taints" its vote, separate classification is not improper gerrymandering. *Heritage Org.*, 375 B.R. at 303-04 (collecting cases). The majority of those cases were ones where the creditor's non-creditor interest caused it to have "a different stake in the future viability of the reorganized company." *See U.S. Truck*, 800 F.2d at 587 (noting that the union in the case had such a "different stake" in the debtor's future and that it also had "alternative means at its disposal for protecting its claim").

A creditor's ongoing involvement in litigation with the debtor has been held to be such a non-creditor interest, justifying separate classification of the creditor's claim. *See e.g., Heritage Org.*, 375 B.R. at 305 (referring to the estate's avoidance and contract damages litigation against the creditors); *accord, In re Cornwall Pers. Ins. Agency, Inc.*, No. 02-50463-RLJ, (Bankr. N.D. Tex. Feb. 23, 2003) (*cited in Heritage Org.*, 375 B.R. at 300); *see generally In re Adelphia Communications Corp.*, 368 B.R. 140, 247 (Bankr. S.D. N.Y. 2007) (finding that separate classification of trade claims was proper where they were "generally liquidated" and other unsecured

---

[19] In the context of this argument (unlike a "business justification" argument for separate classification), a finding that the claim is treated identically to the other unsecured claims is not conclusive, although it is evidence that the alleged difference between the claims is not such as would call for the Debtor to favor one over the other in terms of treatment. *Heritage Org.*, 375 B.R. at 305 (examining an argument for separate classification based on non-creditor interests and observing that "where all unsecured claims receive the same treatment despite their separate classification, their separate classification bears special scrutiny, as it may suggest an improper motive to gerrymander affirmative votes"); *see e.g., In re Briscoe Enter., Ltd., II*, 994 F.2d 1160, 1167 (5th Cir. 1993), *cert. denied, Heartland Fed. Sav. and Loan Ass'n v. Briscoe Enter., Ltd., II*, 510 U.S. 992 (1993) (decided after *Greystone* and permitting separate classification among unsecured claims based on creditor's non-creditor interest, even though their treatment was identical).

claims were "primarily unliquidated litigation and rejection damage Claims"), *appeals dismissed,* 367 B.R. 84, 371 B.R. 660 (S.D. N.Y. 2007).

In particular, SOS argues that the desire to avoid future litigation with it is one of Sweetwater's major, if not its primary, motive in opposing the Debtor's reorganization. Specifically, the Debtor claims that the evidence at trial showed that:

> Sweetwater and its principal, William T. Gunn, III, and their related entities, would benefit mightily from the demise of the Debtor [because they] own or control extensive tracts of real property, held for development, in the Hill Country of Central Texas . . .. These are the geographic areas in which SOS Alliance has been most active in its legal advocacy and public policy work, in terms of challenging proposed development . . ..

Debtor's Classification Brief, p. 7.

The Court has carefully considered the evidence at trial, however, and finds that the Debtor failed to sustain its burden of proving that Sweetwater would likely be involved in future litigation with the Debtor regarding projects other than the one from which Sweetwater's existing claim against the Debtor arose, and that Sweetwater is voting on the Plan solely, or even primarily, because of its interest in avoiding such unrelated litigation. The Debtor points to certain remarks of counsel for Sweetwater as evidence supporting its position. *See* Docket No. 74, Debtor's Classification Brief, pp. 8-9. Those remarks were made during Sweetwater's counsel's argument at the hearing on approval of the Debtor's disclosures in connection with its Plan, in response to a question by the Court. Specifically, the Court asked whether the benefit to Sweetwater, in the event the Debtor was "ultimately put out of business," would be the "buying [of] peace, for lack of a better word, from future litigation." To this query, counsel for Sweetwater candidly answered in the affirmative. That comment, made in response to a direct question and not as an affirmative argument, is insufficient evidence to show that Sweetwater's sole or primary goal or motive in rejecting the Plan was the avoidance of some litigation other than the litigation involving its current judgment claim against the Debtor.

48

However, there *is* substantial evidence in the record that the Debtor intends to pursue an action to void Sweetwater's judgment. *See* Docket No. 44, Debtor's Application to Employ Special Counsel for State Court Litigation, Philip Durst and Deats Durst Owen & Levy, P.L.L.C.; Docket No. 125, Order Approving such Application; Docket No. 61, Debtor's Objection to Claim of Sweetwater Austin Properties, L.L.C. (Claim No. 6), Docket No. 26, Interim Order regarding such Objection, providing that the Court abstains and granting the Debtor "leave to pursue, at its option, the litigation of issues in the courts of the State of Texas." It is clear that Sweetwater does desire to avoid that litigation, as evidenced by its objection to the Debtor's retention of counsel to pursue that action. *See* Docket Entry # 48, Objection to Application to Employ Special Counsel to Represent the Debtor in Certain State Court Litigation, and record of hearing on such Application held in conjunction with the confirmation hearing and on February 21, 2008.

Under the facts of this case, however, the Court is not convinced that the possible continuance of litigation over Sweetwater's claim is the sort of "non-creditor" interest that would justify separate classification. As stated above in the section addressing designation of Sweetwater's vote as having been cast in bad faith, its desire to end the litigation over its claim is an integral part of its "creditor interest." This Court need not decide, however, whether the still-contested nature of Sweetwater's claim is, by itself, enough to make separate classification permissible. That is because, even though the First Amended Plan contemplates that the Debtor may continue its litigation on Sweetwater's claim in State Court, the Debtor has failed to show that denial of confirmation of the Plan would necessarily or even probably result in the Debtor abandoning that litigation. Thus the Debtor has failed to prove the necessary "link" between Sweetwater's negative vote on the Plan and its interest in avoiding that litigation, and so has failed to show that Sweetwater's non-creditor interest, if it is one, has "tainted" its vote.

To summarize, the Court finds that the Debtor has failed to show any basis, in law or fact, for the classification of Sweetwater's claim separate from the Class 6 Claims. The evidence was insufficient to show that SOS had any legitimate motive for separately classifying Sweetwater's claim from the Class 6 claims. Rather, the Court finds, its purpose in doing so was to improperly gerrymander the vote.[20]

### Plan Confirmation Issue II:
### Lack of an Impaired Accepting Class

Sweetwater argues that the Plan fails to comply with § 1129(a)(10) and that it therefore violates § 1129(a)(1), which requires that a plan must comply with the applicable provisions of the Bankruptcy Code in order to be confirmed. Section 1129(a)(10) provides that "[i]f a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider." In particular, Sweetwater argues that (1) because its claim and the Classes 5 and 6 claims must be classified as a single class and its rejecting vote would control the acceptance or rejection of that class, and (2) because there are no other impaired accepting classes except when the claims of insiders are considered, there is no qualifying impaired class that has accepted the Plan. This is because, Sweetwater also argues, Class 3 consists of insiders and/or is not a "true class" since those claimants have no right to payment and their claims are "illusory."

---

[20] In so finding, the Court realizes that, since it has decided that Class 5 was properly separately classified, if that Class were considered an impaired consenting class there would have been no "gerrymandering" purpose in the Debtor's classification of Sweetwater separate from the Class 6 claims. However, the Debtor chose its classification scheme prior to its settlements with the Class 5, and absent those settlements their classification separate from Sweetwater's and the Class 6 claims would not have been proper, and the Class 5 creditors, like Sweetwater, would have rejected the Plan. Thus, the Court finds that, given the parties' positions at the time of the Debtor's initial proposal of its classification scheme, its motive was to gerrymander the vote so that the vote of Class 6 would satisfy the requirement of an impaired accepting class.

The Court has found that the separate classification of Sweetwater's claim from those in Class 6 is not proper, but that the separate classification of Class 5 is permissible. The acceptance of Class 5 and/or Class 6, without considering the vote of any insider, would satisfy the requirement of § 1129(a)(10). Mak Foster's claim, because its settlement is contingent upon confirmation, is impaired. *See In re Wabash Valley Power Ass'n, Inc.*, 72 F.3d 1305, 1320 (7th Cir. 1995), *cert. denied,* 519 U.S. 965 (1996) (creditor's claims were properly found to be impaired, for cramdown purposes where, among other things, plan's confirmation affected interests of creditor both with respect to its settlement of other litigation between it and debtor and with respect to its ongoing business relationship with debtor, and creditor's settlement with debtor was dependent upon approval of debtor's plan); *see* SOS Exh. 1, Ballot Summary. Thus, the Court finds that Class 5 is an impaired accepting class. Sweetwater's objection to the First Amended Plan on the grounds that there is no impaired accepting class is therefore denied.

Because of the Court's ruling that the Plan satisfies § 1129(a)(10) based on the votes of impaired accepting Class 5, it need not at this time, and does not, reach the issues of whether the holders of all the claims in impaired accepting Class 3 should be considered to be insiders and whether that Class should be considered a "true class."

### Plan Confirmation Issue III:
### Best Interests of Creditors Test Not Met

Sweetwater in its Objection to Confirmation argues that the Debtor fails to prove the liquidation values of its assets, and its Plan therefore fails to meet the requirements of § 1129(a)(7) requiring that unsecured creditors receive at least as much under the Plan as they would receive in a Chapter 7 liquidation of the Debtor. The Court finds the evidence offered by the Debtor regarding its assets and their values, including the testimony of Pat Broadnax, Ray Goodrich and Kirk Mitchell, to be credible and substantial. It is satisfied that such evidence, considering the unique nature of the Debtor as a non-profit organization dependent on contributions that are voluntary and

may be restricted, and of the Debtor's other assets, is sufficient proof in this case that the Plan meets the "best interests test" of § 1129(a)(7). *See generally **In re General Teamsters, Warehousemen and Helpers Union, Local 890**,* 265 F.3d 869 (9th Cir. 2001) (Chapter 11 debtor-local union's collective bargaining agreement and its right to collect future member dues could not under applicable labor law have been liquidated to pay off debtor's creditors and, thus, additional assets would not have been available for distribution in a Chapter 7 liquidation, so that proposed reorganization plan satisfied the "best interests of creditors" test). Sweetwater's objection to confirmation on these grounds is therefore overruled.

## Plan Confirmation Issue IV:
### Feasibility of the Plan

Sweetwater alleges that the Plan violates § 1129(a)(11) in that the Plan if confirmed most likely will be followed for a need to convert to Chapter 7 because the Debtor has not raised sufficient monies to fund the Creditor Settlement Fund. *See* 11 U.S.C. § 1129(a)(11) (requiring, in order to confirm a plan, that the court find that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor, unless such liquidation or reorganization is proposed in the plan."). In addition, Sweetwater contends, the Debtor has not shown how it will pay administrative claims from operations.

> As numerous courts have explained, "the court need not require a guarantee of success," which of course would be difficult to predict for any venture much less one emerging from chapter 11. "Only a reasonable assurance of commercial viability is required.". . . Our task is to determine whether it was clearly erroneous for the bankruptcy court to find that the plan provided a reasonable assurance of commercial viability by a preponderance of the evidence.

***Briscoe Enter.***, 994 F.2d at 1165-66 (footnotes omitted), *citing, e.g.,* ***In re Lakeside Global II***, 116 B.R. 499, 507 (Bankr. S.D. Tex. 1989); *accord,* ***In re T-H New Orleans Ltd. P'ship***, 116 F.3d 790, 801 (5th Cir. 1997) ("All the bankruptcy court must find is that the plan offers 'a reasonable probability of success.'"), *quoting* ***Landing Assoc.***, 157 B.R. at 820; *see also* ***In re M & S Assoc.***,

*Ltd.*, 138 B.R. 845, 849 (Bankr. W.D. Tex. 1992) ("The feasibility test contemplates the probability of actual performance of the provisions of the plan, and whether the things to be done under the plan can be done as a practical matter under the facts.").

The Plan, in Para. 7.1, provides that SOS "will collect and deposit [new contributions from donors in the amount of $60,000] into the Creditor Settlement Fund within sixty (60) days of the Effective Date." The Effective Date is defined under the Plan as "that date on which the order confirming the Plan becomes final and nonappealable." Plan Definitions, p. 3, Para. 8.

The evidence was clear that the Debtor had not raised the $60,000 as of the confirmation hearing. The fact that SOS built into its Plan a delay in its obligation to obtain those funds does not relieve it of its burden to show that it will be able to perform under the Plan. True, under the terms of Para. 7.3, it would not be in default the moment an order confirming the Plan were entered but would have time to obtain more contributions to fund the Creditor Settlement Fund. However, it offered *no* evidence at the hearing to show that it *could* meet that obligation–no commitments, no evidence of relevant past performance, *nothing*. On the contrary, Kirk Mitchell testified that as of the date of the hearing he had expressly *not* agreed to contribute any amount to be used to fund the Creditor Settlement Fund.

This Court agrees that feasibility need not be guaranteed but, rather, only a reasonable prospect of success must be shown. However, "[w]ithout evidence of a firm commitment of financing, [a] Plan does not meet the feasibility requirement for confirmation." *In re Ralph C. Tyler, P.E., P.S., Inc.*, 156 B.R. 995, 997 (Bankr. N.D. Ohio 1993) (source of outside funding referenced in Chapter 11 plan must be shown to be firm, since it pertains directly to feasibility of plan). Moreover, the courts require specific, concrete evidence to support feasibility. *See generally M & S Assoc.*, 138 B.R. at 849 ("Income projections offered in support of reorganization plans must be based on concrete evidence of financial progress, and must not be speculative, conjectural or

unrealistic."), *citing In re Canal Place Ltd.*, 921 F.2d 569, 579 (5th Cir. 1991) ("Speculative, conjectural or unrealistic projections by Debtor cannot support Debtor's predictions of future performance.").

For example, in *In re Wiston XXIV, Ltd. Partnership*, the bankruptcy court found that the proposed Chapter 11 plan was not sufficiently feasible where it showed negative cash flow unless the debtor's partner made the capital contributions he promised to debtor, and the partner's promise to make those cash infusions was not supported by proof that he had any tangible means of satisfying that promise. *In re Wiston XXIV, Ltd. P'ship*, 153 B.R. 322, 327 (Bankr. D. Kan. 1993), *appeal dism'd,* 170 B.R. 453, *motion to amend denied,* 172 B.R. 647, *aff'd,* 45 F.3d 441 (10th Cir. 1994), *cert. denied sub nom. Wiston XXIV Ltd. P'ship v. Balcor Pension Investors V*, 515 U.S. 1144 (1995). In contrast, in *In re Heron, Burchette, Ruckert & Rothwell* the bankruptcy court held that the evidence of feasibility was sufficient where the partners of the debtor partnership, who would fund plan payments from their contributions, had pledged their performance with notes easily enforceable under state law and, as attorneys, had a reasonable probability of earning substantial amounts of money in future. *In re Heron, Burchette, Ruckert & Rothwell*, 148 B.R. 660, 678, 684 (Bankr. D. Colo. 1992).

Moreover, in determining feasibility, the court need not accept unsubstantiated statements of confidence in the income projections where there was undisputed evidence of a general downward trend in the debtor's income and a total absence of recent income. *In re Prudential Energy Co.*, 59 B.R. 765, 767-78 (Bankr. S.D. N.Y. 1986).

The bankruptcy court in *In re Repurchase Corp.*, 332 B.R. 336, 343-44 (Bankr. N.D. Ill. 2005), in the context of deciding a debtor's motion to reconsider denial of confirmation of its plan, addressed facts similar to those in this case. In *Repurchase*, the debtor had been in the business of acquiring and selling investment securities, but it had not acquired any in the three years before it

filed its Chapter 11 case. *Id.* at 338. Its net operating loss carryovers were its only asset. The plan provided that Mr. Greenblatt, one of its two shareholders, would contribute $100,000, and at the confirmation hearing he testified that it was actually his wife, the other shareholder, who would be providing the $100,000. *Id.* at 339. No evidence regarding the availability of those funds was introduced, and Mr. Greenblatt also acknowledged that since the debtor's bankruptcy filing it had been unable to attract new investors in it, to enable it to purchase new investments post-petition. *Id.* The court noted that the debtor had

> chose[n] to solely rest this burden on the testimony of its president . . .[and t]he only evidence offered on that point [regarding the funding] came in the form of Mr. Greenblatt's testimony that his wife would be the contributing source for needed capital and that Debtor would also enter into 'sharing agreements' for unitization of its NOLs for the purpose of generating cash for post-confirmation operations.

*Id.* at 343. The court held that "in the absence of any form of corroboration or contract from the alleged sources of these funds, Mr. Greenblatt's testimony amounted to nothing more than sheer speculation and wishful thinking," and that "the testimony of Debtor's officer about hopes for funding was neither corroborated nor credible" and, therefore, feasibility had not been proven. *Id.* at 343-44. In so holding, the court noted:

> Allowing Debtor's confirmation to be based on a "hope against hope that the financing [would] actually materialize" post-confirmation without some form of corroboration would go against a bankruptcy judge's duties of ensuring that the Plan complies with the provisions of the Bankruptcy Code. *Matter of Midwestern Companies, Inc.*, 55 B.R. 856, 863 (Bankr. W.D. Mo. 1985); *see also Prudential Energy Co.*, 59 B.R. at 766. As the Plan's proponent, Debtor had the obligation of proving that the Plan, as proposed, was feasible. Optimistic but hollow declarations from Debtor's President about hopes for funding did not satisfy its burden of proof.

*Id.* at 343.

In this case, SOS's evidence at the trial regarding the availability of the monies to fund the $60,000 Creditor Settlement Fund under the Plan was limited to Mr. Goodrich's testimony that he had committed to donate $12,500 for that purpose, and Mr. Mitchell's testimony that he had not agreed to donate anything for that purpose. Considering this evidence, the proof offered by the

Debtor concerning the funding of the Creditor Settlement Fund—*the* critical feasibility issue under the Plan—"amounted to nothing more than sheer speculation and wishful thinking." The Court finds that the Debtor has failed to sustain its burden of showing that the First Amended Plan is feasible.

It might be argued that another provision of the Plan, one "undoing" the Debtor's discharge in the event of default, "cures" any feasibility problem. Section 1141(d)(1) of the Bankruptcy Code provides, in relevant part, that "[e]xcept as otherwise provided in this subsection, in the plan, or in the order confirming the plan, the confirmation of a plan . . . discharges the debtor from any debt that arose before the date of such confirmation . . . ." Consistent with that provision, Para 7.3 of the Debtor's Plan in this case provides that "[t]he Order Confirming the Plan shall be a judicial determination of the discharge of liabilities of and claims against the Debtor, except as otherwise provided herein."

However, Article X of SOS's Plan, containing provisions governing consequences and remedies upon default under the Plan, provides that under certain circumstances, the Debtor's discharge will "disappear" and the creditors' claims may be reinstated in full. Specifically, Article X provides that (1) a creditor must provide notice of a default under the Plan to the Debtor, (2) which then has fifteen days from receipt of that notice to cure. Then, if (3) there is no timely cure, and (4) the creditor obtains a determination from the Bankruptcy Court that the Debtor has in fact defaulted and has not timely cured,[21] then and only then "each creditor or party in interest [in the bankruptcy case] will be entitled to assert its claim or claims as if this Plan had not been confirmed,

---

[21] Article X nominally also includes an alternative to the requirement that the Court make a determination regarding the default and failure to cure: that the creditor succeeds in converting the case to Chapter 7. However, the Debtor has argued, and Sweetwater has conceded, that the Court cannot convert the case of a non-profit organization such as SOS on motion of any party other SOS, rendering this provision meaningless. *See* 11 U.S.C. § 1112(c) ("The court may not convert a case under this chapter to a case under chapter 7 of this title if the debtor is a farmer or a corporation that is not a moneyed, business, or commercial corporation, unless the debtor requests such conversion.").

and shall not be limited to the payments proposed by this Plan to be paid or distributed to such creditor [*sic*]."

Such a provision, rather than curing the Debtor's failure to show the Plan is feasible, merely highlights that failure. In *In re Investment Co. of the Southwest, Inc.*, 341 B.R. 298, 317 (10th Cir. BAP 2006), the Court addressed the feasibility of a plan that included a drop-dead clause allowing the creditor to immediately foreclose upon default. The Court held that, while such a clause "may result in the creditor not losing as much–because it can more quickly liquidate the remaining collateral upon default . . . it does not, on the front end, support a finding that a plan, itself, is not likely to be followed by the liquidation of, or the need for further financial reorganization by, the debtor." The Court cited *In re Danny Thomas Prop. II Ltd. P'ship*, 241 F.3d 959, 963 (8th Cir. 2001), for its holding that "the mere right to foreclose upon default does not render a plan feasible as a matter of law[, but, r]ather, a court must look at whether the property that the creditor would be entitled to foreclose and sell would be sufficient to pay the remaining claims," and found that the drop-dead clause in its case did not "ensure feasibility" because there were "too many unknown factors for a court to conclude that in the event of a default [the creditor] would in all circumstances be made whole through foreclosure of assets in which it holds a lien, or otherwise." *Investment Co. of the Southwest*, 341 B.R. at 317.

In contrast, the Fifth Circuit Court of Appeals in *In re T-H New Orleans Ltd. P'ship*, 188 B.R. 799 (E.D. La. 1995), *aff'd* 116 F.3d 790 (5th Cir. 1997), affirmed the confirmation of a Chapter 11 plan and held that its alternative provisions *did* suffice to establish feasibility even where the evidence may have shown that it was not feasible under other possible scenarios. In particular, the Court held that the plan was still feasible even though, among other things,[22] the evidence at the

---

[22] As the district court noted in its opinion, the plan in *T-H New Orleans* was not an all-or-nothing proposition, but rather provided numerous alternatives, all of which it found should or at least reasonably could have resulted in full payment of the creditor's claim. *In re T-H New*

confirmation hearing was that the debtor's partners, who were required under the plan to infuse capital to make it work, were not identified in the plan and had given no written commitments.[23]

In this case, unlike the plan considered in *T-H New Orleans*, no support has been offered for the proposition that a provision that merely puts Sweetwater back in its pre-petition position, let alone makes it whole, suffices to show that the Plan "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor." 11 U.S.C. § 1129(a)(11). Merely including an alternative provision that its discharge is conditioned on performance does not rescue the Plan from a finding of infeasibility.

Like the provisions in SOS's Plan conditioning its discharge on performance under the Plan, the plan considered by the Court in *In re Sis Corp.*, 120 B.R. 93 (Bankr. N.D. Ohio 1990), also contained conditions. Specifically, the Court found that the plan was contingent on three conditions precedent, including "the availability of sufficient cash to satisfy all administrative claims, allowed priority claims, and allowed tax claims." *Id.* at 95. It also provided that "[n]otwithstanding entry of the Confirmation Order, if, on or before the Effective Date, the Conditions set forth in this Article VII have not been satisfied or waived in writing by Debtors, the Plan shall be void and of no effect." *Id.* Under those circumstances, the Bankruptcy Court held

---

*Orleans Ltd. P'ship*, 188 B.R. 799 (E.D. La. 1995). Among those alternative provisions was a liquidation scenario which the court found would have fully compensated the creditor without any action by the debtor. The other obstacles to feasibility that were noted by the district court were (1) that appreciation of the debtor's hotel would be counted on to make the alternative balloon payment under the plan, (2) that the debtor used high revenue projections for showing feasibility while using low projections for valuations, (3) that one of the debtor's officers left out several material expenses exceeding $140,000, and (4) that the plan did not expressly require the debtor to bargain for a purchase money note that was enforceable. In spite of all of these deficiencies, the district court affirmed the bankruptcy court's finding that the plan was feasible.

[23] Specifically, the Court of Appeals found that it was sufficient that the trial court in its opinion did identify the partners and provide that the plan would contain their promise to pay when it was confirmed. *T-H New Orleans*, 116 F.3d at 805. Moreover, the Court held that under these circumstances the trial court would have the power to order the partners' cash infusion. *Id.*

The above conditions precedent remove the certainty of plan implementation required to be in place as of the time of a confirmation hearing. The above-quoted language is clear to state that such conditions must either be satisfied or waived by the Debtors. Effectively, those conditions imposed by the Debtors leave the affected claimants at the mercy of the Debtors, in total disregard of the confirmation process. Such an approach renders the Plan infeasible.

*Id.* Like the court in ***Sis Corp.***, this Court finds that the provisions of SOS's Plan, giving it sixty days following the Effective Date to come up with the $60,000 required to fund the Creditor Settlement Fund and negating its discharge in the event it fails to do so, leaves Sweetwater "at the mercy of the Debtor[ ], in total disregard of the confirmation process [and] renders the Plan infeasible."

Based on all of the foregoing, this Court finds that the language of the Plan in this case, providing that there will be no discharge and that all creditors are returned to their original positions, does not cure the Debtor's failure at the confirmation hearing to show that it can make the payments called for by the Plan. Therefore, and because of the lack of evidence regarding the funding of the Creditor Settlement Fund, the Court finds that the Debtor has failed to sustain its burden of proving that the Plan is feasible.[24]

### Plan Confirmation Issue V:
### Discharge Is Not Permissible Where the Plan in Essence
### Does Not Provide for the Debtor's Continuation in "Business"

One of Sweetwater's arguments for denying confirmation of SOS's Plan is that it impermissibly provides for the Debtor's discharge when the evidence established that it in fact was not continuing its "business" but that essentially all of its donations were being passed through to

---

[24] Based on this holding, the Court finds it unnecessary to rule on Sweetwater's alternative argument, that the Debtor failed to show that it was able to pay administrative claims in full, as required by 11 U.S.C. § 1129(a)(9). The Court notes, however, that there was evidence that the administrative claimants in this case had waived their rights to immediate payment, and Kirk Mitchell testified that he and his father had traditionally provided donations restricted to paying for SOS's legal fees and operating expenses.

the Greater Edwards Aquifer Alliance, which is pursuing the work that SOS had historically been doing. The Court finds that the evidence was insufficient to support this argument and rejects it.

### Plan Confirmation Issue VI:
### Cramdown Is Not Permissible in This Case,
### Where Insider Claims Are Not Subordinated to Payment in Full of All Other Claims

Sweetwater maintains that the Plan cannot be confirmed under § 1129(b) because it is not fair and equitable to Sweetwater. Specifically, the Plan does not provide Sweetwater with property with a value equal to the allowed amount of Sweetwater's claim on the effective date of the Plan while, it contends, insider claims are not subordinated to its claim for purposes of distribution under the Plan.

Section § 1129(b)(1), the "cramdown" requirement for confirmation, provides in relevant part that "the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of [§ 1129(a)(8) requiring that each impaired class accept the plan] if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." Section 1129(b)(2)(B), in turn, defines "fair and equitable" with respect to a class of unsecured claims as requiring a plan to provide "that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or [that] the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property . . .." Sweetwater argues that inasmuch as neither of these alternative requirements have been met, SOS's Plan cannot be crammed down on it.

SOS has not disputed that under the Plan, Sweetwater's claim will not be paid in full, and so clearly the first of the alternatives, that Sweetwater receive under the Plan "property of a value, as of the effective date of the plan, equal to the allowed amount of such claim," is not met.

The second alternative, that "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest" is often referred to as the "absolute priority rule." SOS's Plan does not provide for equity holders to receive or retain an interest, because the Debtor, as a non-profit organization, has no equity holders. *See e.g., In re General Teamsters, Warehousemen and Helpers Union, Local 890*, 265 F.3d 869 (9th Cir. 2001) (affirming bankruptcy court's holding that a labor union, which was a non-profit entity, had no equity holders and that, therefore, the absolute priority rule was not applicable to its Chapter 11 plan); *In re Wabash Valley Power Ass'n., Inc.*, 72 F.3d 1305 (7th Cir. 1995) (holding that the absolute priority rule was not applicable to the Chapter 11 plan of a non-profit electric cooperative which had no equity holders), *cert. denied sub nom. U.S. v. Wabash Valley Power Ass'n, Inc.*, 519 U.S. 965 (1996); *In re Independence Village, Inc.*, 52 B.R. 715, 726 (Bankr. Mich. 1985) (noting, in deciding the likelihood of an effective reorganization for purposes of § 362 stay relief litigation, that the Chapter 11 debtor, which operated a 252-unit life-care facility for the elderly, was "a non-profit corporation. It has no shareholders, hence there are no interests inferior to the unsecured creditors[ and, t]hus there should be little difficulty with the absolute priority rule . . ..").

Sweetwater does not dispute that general proposition, but argues that the insider claims in this case should be subordinated to it, and not receive or retain any property since Sweetwater's claim is not being paid in full. The Court disagrees. Several courts have expressed the opinion that the claim of an insider or equity holder may not be treated unequally unless the insider or equity holder used superior knowledge concerning the debtor's affairs in an unfair manner or equitable subordination principles otherwise apply. *See e.g., In re ARN LTD. Ltd. P'ship*, 140 B.R. 5, 13 (Bankr. D. Colo. 1992), *citing In re Holywell Corp.*, 913 F.2d 873, 880 (11th Cir. 1990) (holding that the mere fact that a claim is held by an equity security holder does not justify its subordination

and insider claims may be equitably subordinated only based on evidence of unfair conduct); *Heritage Org.*, 375 B.R. at 301 (agreeing that "separate classification solely on the basis of 'insider' status is improper").

In *Brinkley v. Chase Manhattan Mortgage & Realty Trust (In re LeBlanc)*, 622 F.2d 872 (5th Cir. 1980) (decided under the Bankruptcy Act), the Court permitted separate classification and less favorable treatment of insiders holding unsecured claims, "focusing on three factors: (1) there was no equity in the debtor's property for distribution to unsecured creditors, such that the insiders who took nothing under the plan would have taken nothing in Chapter 7; (2) the majority of insiders did not object to the classification scheme; and (3) the classification was not arbitrary and discriminatory." *Heritage Org.*, 375 B.R. at 299 (describing *LeBlanc*). The *LeBlanc* Court found the classification not arbitrary or discriminatory because it found that "the insiders made loans to the debtor when they were in a position to know of the debtor's financial condition and the risks involved with those loans [and] the insiders were not going to have any ongoing relationship with the hotel after confirmation of the plan." *Id.* (citing *LeBlanc*, 622 F.2d at 879).

Sweetwater has not specifically identified in its Objection to Confirmation which insider claims it complains the Plan "allow[s] . . . to receive equal distributions." Docket No. 72, Sweetwater Objection to Confirmation, p. 6. Presumably, it is insider claims in Class 6 to which Sweetwater refers, since that is the only Class that will "receive equal distributions" to those that Sweetwater will receive on its claim. The only insider claims in Class 6 are Kirk Mitchell's general unsecured claims. However, the evidence was that Mitchell had been loaning to the Debtor and guaranteeing its loans long before the litigation in which Sweetwater obtained its judgment and the resultant change in SOS's financial condition. In addition, Mitchell is one of the Debtor's founders and largest donors, and it is largely through his efforts and relationship with his father that SOS receives donations from the latter, by far its largest donor. The Court therefore finds that

maintaining its relationship with Kirk Mitchell is critical to SOS's future viability as a donation-funded non-profit organization. Thus, no basis under *LeBlanc* was shown for separate classification and less favorable treatment of Mitchell's claims, and so no basis was shown for subordination of Mitchell's claims.

Moreover, the Court notes that, while Sweetwater has the right to object to any insider claim, at this point it has not done so nor has it initiated any action to equitably subordinate any claim. *See* 11 U.S.C. § 502(a) (providing that a claim is deemed allowed unless an objection is filed by any party in interest). Based on all the foregoing, therefore, the Court overrules Sweetwater's objection to confirmation on the grounds that the Plan is not fair and equitable with respect to its claim as required under 11 U.S.C. § 1129(b)(2)(B).

### Plan Confirmation Issue VII: Lack of Good Faith

Finally, Sweetwater argues that the Debtor's Plan does not satisfy § 1129(a)(3), which provides that in order to confirm a plan the court must find that it "has been proposed in good faith and not by any means forbidden by law." Specifically, Sweetwater claims that the Plan is not proposed in good faith because it was not proposed with good intentions and cannot be effectuated with results consistent with the objectives and purposes of the Bankruptcy Code. It argues in support of that contention that the Plan proposes only minimal payments to creditors and that the Debtor has on hand less than a third of the money needed to fund even those small payments from the Creditor Settlement Fund. Sweetwater further notes that the Debtor's desire not to use its restricted funds to fund the Plan also indicates that the Debtor does not intend to repay creditors to the maximum extent possible.

The Fifth Circuit Court of Appeals has held that "[w]here the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of section 1129(a)(3) is satisfied." *In re Sun Country Dev., Inc.*, 764 F.2d 406, 408

(5th Cir. 1985). "The requirement of good faith must be viewed in light of the totality of the circumstances surrounding establishment of a Chapter 11 plan, keeping in mind the purpose of the Bankruptcy Code is to give debtors a reasonable opportunity to make a fresh start." *In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 802 (5th Cir. 1997), *citing Sun Country*, 764 F.2d at 408. Moreover, "[a] plan may not be the one that the creditors would themselves design and may indeed not be confirmed and yet still pass the good faith requirement." *Briscoe Enter.*, 994 F.2d at 1167.

While the question is a close one precisely because of the Plan's impermissible classification scheme and the small size of the payments proposed, the Court nevertheless finds that its provision for Sweetwater's claim to be paid *pro rata* with other unsecured claims from a designated fund consisting of only $60,000, obtained by the Debtor from specific donations solicited for that purpose, does not amount to bad faith. The evidence presented at the hearing demonstrated SOS's lack of assets, the recent decline in donations that it has received since Sweetwater and the other judgment creditors obtained their judgments, and the difficulty that SOS has had in soliciting future donations and/or commitments to donate for the purpose of funding the Creditor Settlement Fund under the Plan.

In addition, SOS's donors' ability to restrict their donations to particular uses, not including the payment of judgments, is clearly problematic in determining how much SOS should be required to pay on those judgments. Sweetwater argues that the Debtor's position that certain of its donations are "restricted" and so are not property of its estate and not available to pay its creditors, is evidence that it lacks good faith in proposing its Plan. In particular, Sweetwater argues that because SOS commingled its grant funds, they either never were truly "restricted" or they have lost their "restricted" character. The Court disagrees, however, and finds that the restricted funds held by the Debtor are not property of the estate.

Section 541(a) provides that "property of the estate" comprises "all legal or equitable interests of the debtor in property as of the commencement of the case." As pointed out by the Debtor in its Brief, § 541(f) now provides:

> Notwithstanding any other provision of this title, property that is held by a debtor that is a corporation described in section 501(c)(3) of the Internal Revenue Code of 1986 and exempt from tax under section 501(a) of such Code may be transferred to an entity that is not such a corporation, but only under the same conditions as would apply if the debtor had not filed a case under this title.

Thus, as with most determinations of whether or not a particular asset is property of a bankruptcy estate, state law governs the determination of the debtor's interest in the property. *See generally, Barnhill v. Johnson*, 503 U.S. 393, 398 (1992) ("In the absence of any controlling federal law, 'property' and 'interests in property' are creatures of state law."), *citing, among others, Butner v. United States*, 440 U.S. 48, 54 (1979) ("Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law").

Nothing in the terms of the grants themselves would require physical segregation of SOS's restricted funds, nor have the parties pointed to anything in Texas law that would require such segregation. SOS Exh. 5, Tabs E and G, Letters setting forth terms of Goodrich and Feldman Grants. The Debtor *did* account for its restricted monies separately. SOS Exh. 5, Tabs F and H, Debtor's Class QuickBooks showing expenditures from the Goodrich and Feldman Grants.

As discussed above, Sweetwater offered Gary McIntosh as an expert on the Debtor's use of restricted funds. According to his testimony and his resume (SW Exh. 34), Mr. McIntosh has extensive experience with respect to various aspects of accounting for non-profit organizations, including the accounting practices used by grant recipients, and the Court has accepted him as such an expert. Mr. McIntosh established that the Debtor apparently spent some ($18,829.93) of the Goodrich Grant on items it was not authorized under the terms of the Grant to pay from those funds.

In particular and as set out above, according to Mr. McIntosh's testimony and his written opinion (SW Exh. 33), the Debtor's QuickBooks class report (SOS Exh. 5, Tab F) and bank records show that $46,972.71 of the Goodrich Grant should have been in the Debtor's accounts as of the petition date. Even assuming, as the Debtor argues, that all of the overhead chargeable to the Grant ($12,000) had properly already been deducted from that amount, it should have had no less than $34,972.71 of the Grant money as of the petition date.

The Debtor argues that it *did* have $31,156.21 of the Grant, in an account that was designated to hold restricted funds only (the "Segregated Account"). However, according to Mr. McIntosh's testimony and the Debtor's records, two days before the first of the transfers that funded that Segregated Account, there remained *at most* only $16,142.78 of the Grant money because that is all SOS's general account, where the Goodrich Grant funds had been kept, contained at that point. Accordingly, the Court finds, the Debtor spent at least $18,829.93[25] of the Goodrich Grant without authorization.

The fact that there was a petition date balance of $31,156.21 in the Segregated Account, denominated the "Education & Outreach Fund," therefore does not help the Debtor. SOS Exh. 51. Since the $31,156.21 that was transferred from the General Account into the Segregated Account in fact consisted of only $16,142.78 in actual Grant funds, the remainder of the transferred money ($15,013.43) could not have been Grant funds. Rather, Mr. McIntosh established and the Debtor's bank statements show, and the Court hereby finds, that the source of that $15,013.43 had to have

---

[25] This amount would be greater if the Court were not to assume, without deciding, that the entire $12,000 was properly deducted from the Grant balance pre-petition.

Further, the Court's finding herein that $18,829.93 of the Goodrich Grant was the amount spent without authorization, is expressly limited to a finding for purposes of confirmation of the Debtor's Plan only. Considering the parties represented at the hearing and the limited evidence on the issue, the Court finds that such finding should not be binding on SOS or any other party with an interest in the Grant funds in any other litigation regarding the propriety of SOS's spending of the Goodrich Grant.

been a deposit of $34,000 by George Mitchell into the General Account on the day of the transfer to the Segregated Account. There was no evidence that the funds in that deposit were in any way restricted. Accordingly, $15,013.43 of the amount in the Segregated Account on the petition date was *not* restricted funds, but *is* property of SOS's estate.

The Court agrees with Sweetwater that that additional value must be made available under any plan to pay unsecured claims, in accordance with the best interests of creditors test of § 1129(a)(7). Sweetwater also argues that the Debtor's failure to so provide in this Plan, and its attempt to shield from its creditors more of its funds than it is entitled to when it has commingled those funds and not abided by the donors' restrictions prior to filing bankruptcy, show that the Plan is not proposed in good faith. Rather, Sweetwater apparently contends, the Debtor and its major donors are playing fast and loose with the Debtor's major asset, its donations, by labeling them "restricted" when it suits their purposes during bankruptcy and the process of proposing a plan of reorganization, and ignoring those "restrictions" when it did not, prior to the bankruptcy filing.

The Court finds, however, that the Debtor's apparent unauthorized use of restricted funds should not override the express intent of the donors, and should therefore not destroy the overall character of the funds as restricted. The evidence on the issue was limited to the Debtor's inability to explain the accounting that indicates its use of some of the funds was not unauthorized. The Court finds, however, that there was insufficient evidence to establish any sort of complicity between the Debtor and the donors, and or malfeasance or bad faith on the part of the Debtor. Confirmation of this Debtor's Plan has presented a number of unusual and even unique issues, including what a debtor in SOS's position can and must offer creditors when its source of income is donors who have the right to choose whether or not to fund a plan. Based on all the evidence presented and the totality of the circumstances of this case, the Court finds and concludes that "there [wa]s no credible evidence that the Plan was proposed with bad intent or malfeasance, or in

contravention of any applicable law.  It appears that the Debtor[ was] merely exercising [its] rights under the Code." *In re Mortgage Inv. Co. of El Paso, Tex.*, 111 B.R. 604, 612 (Bankr. W.D. Tex. 1990), *citing Sun Country*, 764 F.2d at 408.  The Court therefore finds that the objection of Sweetwater to confirmation based on the Debtor's alleged lack of good faith should be overruled.

## SUMMARY AND CONCLUSION

Based on all the foregoing, the Court finds and concludes that: (1) the Motion to Extend Time should be **PARTIALLY GRANTED** to the extent that the Debtor's deadline to obtain confirmation is extended through the date of entry of the order on that Motion, and **DENIED** to the extent of any further extension, (2) the Vote Designation Motion should be **DENIED**, and (3) confirmation of the Debtor's Plan should be **DENIED.**

A separate order on each matter will be entered in accordance with this Opinion.

# # #